**William Clifford BRYSON, Jr., Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–89–278.

Court of Criminal Appeals of Oklahoma.

May 20, 1994.

Rehearing Denied July 5, 1994.

244

**246**

Eugenie Baumann and Tim Wilson, Asst. Public Defenders, Oklahoma City, for appellant at trial.

Robert Macy, Dist. Atty., Fern Smith, Asst. Dist. Atty., Oklahoma City, for State at trial.

Melody Brannon, Asst. Public Defender, Oklahoma City, for appellant on appeal.

Susan Brimer Loving, Atty. Gen., A. Diane Blalock, Asst. Atty. Gen., Oklahoma City, for State on appeal.

### OPINION

LUMPKIN, Presiding Judge:

Appellant William Clifford Bryson, Jr. was tried by jury and convicted for the crime of Murder in the First Degree (Count I) (21 O.S.Supp.1982, § 701.7); Third Degree Arson (Count II) (21 O.S.1981, § 1403(A)); Solicitation to Commit Murder (Count III) (21 O.S.1981, §§ 701.7 & 701.16); and Conspiracy to Commit Murder (Count IV) (21 O.S. 1981, §§ 421 & 701.7), Case No. CRF–86–4781 in the District Court of Oklahoma County. The jury recommended as punishment the death penalty for Count I; fifteen (15) years imprisonment and ten thousand dollar ($10,000) fine in Count II; one hundred (100) years imprisonment for Count III; and ten (10) years imprisonment on Count IV. The trial court sentenced accordingly and it is from this judgment and sentence that Appellant appeals. We affirm.

Appellant and co-defendant Marilyn Plantz were found guilty of the first degree murder of Mrs. Plantz's husband, James Plantz. On August 26, 1988, at approximately 4:00 a.m., Mr. Plantz, a long time employee at the Oklahoma Publishing Company, left his job and headed home. At that time, Mr. Plantz was insured for approximately two hundred ninety-nine thousand dollars ($299,000.00). At approximately 5:15 a.m. that same morning, in the northeast part of Oklahoma City, the decedent's charred body was discovered inside his burned out pickup truck. The drivers side door was open. The decedent's body was slumped behind the steering wheel and his left leg was outside the pickup, resting flat on the ground. Identified by dental records, an autopsy later revealed that the decedent had died from a combination of a blunt force injury to the head and thermal injuries caused by the fire.

The ensuing investigation into the homicide lead to the decedent's wife and Appellant. They had an ongoing personal relationship and had previously attempted to have the decedent killed. Mrs. Plantz had indicated to Appellant the decedent was abusive to her and she wanted to get rid of him and collect on his life insurance policy. Mrs. Plantz had approached Appellant and Clinton McKimble [1] about killing the decedent and collecting the life insurance proceeds. Mrs. Plantz suggested the two men drive up on the side of his pickup and shoot him, or catch him coming home from work and beat him. McKimble was offered forty-five thousand dollars ($45,000.00) for his part. At that time, McKimble indicated he was not sure he wanted to be a part of the plan. He subsequently changed his mind. With the help of Mrs. Plantz, he and Appellant stole a car and waited for the decedent to get off work. The plan was to drive up behind the decedent, bump his pickup so that the decedent would have to pull over and exit the vehicle, at which time they would kill him with baseball bats provided by Mrs. Plantz. When the men lost the decedent's pickup on the highway, the plan was abandoned. Mrs. Plantz subsequently gave Appellant a gun to shoot the decedent, but he pawned it.

Appellant offered Roderick Farris ($40,-000.00) to kill the decedent. Terry Norman overheard Appellant say he had just talked to Mrs. Plantz. She was upset because the decedent had physically assaulted her. When Farris asked why she just did not divorce him, Appellant answered that she wanted to collect some money. Appellant indicated that if he had to kill the decedent by himself, he was going to catch the decedent coming home from work one morning, beat him with a baseball bat and set him on fire in his truck. A week later, Farris again encountered Appellant and Mrs. Plantz at a local grocery store. Appellant offered Farris ten thousand dollars ($10,000.00) to kill the decedent. He then introduced Farris to Plantz as "the one I was telling you about that would kill your husband." Plantz told Farris it would have to look like an accident. Later that night Appellant, Farris, and McKimble met at the Plantz home where they ate hamburgers and listened to music while waiting for the decedent to come home from work. When Farris heard someone at the front door, Mrs. Plantz told them if it was the decedent to "take him out now". Appellant picked up a hammer and McKimble a knife, but it was not the decedent. Later that night Farris was arrested and jailed on an unrelated charge.

Two days later, Appellant and McKimble were again with Mrs. Plantz. Appellant picked Mrs. Plantz up from work, where she had just quit her job. Waiting for the decedent to go to work at 6:00 p.m., they drove to a bank where Mrs. Plantz withdrew money she subsequently spent on cocaine and beer. Arriving at the Plantz home later that evening, Mrs. Plantz retired to her bedroom at approximately 10:30 p.m. Appellant and McKimble remained in the living room drinking beer and smoking cocaine until approximately 11:30 p.m., when they fell asleep. Hours later, hearing a key in the front door, they hid on opposite sides of the house. The decedent entered the house whistling, a bag of groceries in his arms. Appellant struck first, hitting the decedent with the baseball bat. The decedent cried out for his wife, but Appellant hit him again, with McKimble soon joining in. The men repeatedly struck the decedent because "he would not stay down". Finally, the decedent crumpled to the floor. As he lay moaning, Appellant and McKimble picked him up and took him outside, setting him beside his pickup truck. Mrs. Plantz emerged from the house, handed the pickup keys to the Appellant and commented that the decedent's "head was busted open" and that it was not going to look much like an accident. She told the men "to burn him." They placed him in the bed of pickup and Appellant drove to a deserted location on the route the decedent would have taken to work. McKimble followed in Mrs. Plantz's car. The decedent was placed in the cab of the pickup, behind the steering wheel. His body slumped over to the side. McKimble placed a rag in the gas tank and lit it. It failed to catch on fire. Appellant then poured gasoline on the decedent and in the

---

1. Clinton McKimble was also charged with the first degree murder of James Plantz. He pled guilty to the charge in exchange for a life sentence.

cab of the pickup. He lit it and the pickup caught on fire. As the men drove away, they turned around and saw the decedent raise up.

Appellant and McKimble returned to the Plantz home where Mrs. Plantz was cleaning up the blood. She gave the men clothes of the decedent to put on and placed their bloody clothes in a sack. The men left Mrs. Plantz, threw their bloody clothes in the river and went to a convenience store. With money from the decedent's trousers, the men purchased sandwiches and drinks. After their meal, McKimble went home to bath, saying he was smelling the blood. Appellant went to the home of his friend, Michael Kendrick. Appellant told him he had killed the decedent and explained the details. Kendrick noticed that Appellant had spots of blood on the backs of his hands and on his shoes. Appellant phoned Mrs. Plantz, asking if she was all right. Kendrick overheard Appellant to say that they must stay close. McKimble arrived later and Kendrick overheard the two men talking about the killing and laughing at the decedent calling out for Mrs. Plantz. A short time later, Terry Norman saw Appellant on the street and drove him to McKimble's house. Appellant told Norman he had killed the decedent. Two days later, Appellant told Norman they had beaten the decedent with baseball bats. Appellant said he was going to have some money and he and Mrs. Plantz were moving out of town. Appellant also told another friend, Derrick Jones, that he and McKimble had killed the decedent. Appellant was arrested for the murder shortly thereafter. While in the county jail, inmate Ricky Dunn overheard Appellant tell how he had killed a man about 4:00 a.m. by waiting for him to come home from work, that he beat him to death and that he put him in a truck and "took him out."

## PRE–TRIAL ISSUES

### A.

■ Appellant asserts in his first assignment of error that the trial court erred in denying his repeated requests for a trial separate from that of his co-defendant. Appellant argues that the defenses presented by himself and co-defendant Plantz were mutually antagonistic. Therefore, under recent rulings from this Court, he and his co-defendant were entitled to separate trials. The State disputes this argument claiming that the joint trial was proper as the defenses were not mutually antagonistic.

The record reflects that in pre-trial hearings, Appellant indicated to the court his defense would be one of "heat of passion", that he participated in the murder of the decedent out of love and concern for co-defendant Plantz, while counsel for Mrs. Plantz indicated that her defense was one of non-involvement in any plan to kill her husband.[2] During the first stage of trial, no evidence was presented by either Appellant or co-defendant Plantz. In cross-examination of the State's witnesses and in arguments to the jury, Appellant did not deny his involvement in the killing, but merely attempted to lessen his culpability by portraying himself as intoxicated at the time of the murder, acting at the direction of Mrs. Plantz and calling into question the credibility of the State's witnesses. His co-defendant merely challenged the credibility of the State's witnesses, stressing their criminal convictions and drug abuse.

■ This Court has held that defenses are mutually antagonistic where each defendant attempts to exculpate himself and inculpate his co-defendant. *VanWoundenberg v. State*, 720 P.2d 328, 331 (Okl.Cr.1986), *cert. denied*, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). Defenses have also been found to be antagonistic when in order for the trier of fact to believe the defense of one defendant, it must necessarily disbelieve the defense of the co-defendant. *Neill v. State*, 827 P.2d 884, 887 (Okl.Cr.1992). This two part test for establishing mutually antagonistic defens-

2. Discussions in pre-trial hearings frequently centered around the possible introduction of a video-taped confession of Appellant. However, the tape was not admitted until second stage. Appellant's counsel even commented that if the statement was not used, "it could in some manner correct the severance problem in the first stage and perhaps will 100 percent correct the problem." (M.Tr. 200).

es requires a defendant to both (1) exculpate himself and (2) inculpate a co-defendant. Analyzing the evidence against each defendant separately, it is readily apparent both of these requirements were not met, as neither defendant attempted to exculpate him or herself by inculpating the other. Therefore, we find the defenses of Appellant and co-defendant Plantz were not mutually antagonistic and the trial court's denial of severance proper.

## B.

■ In his second assignment of error, Appellant argues the trial court abused its discretion in finding that no doubt existed as to Appellant's competency and denying the application for determination of competency. Pursuant to 22 O.S.1981, § 1175.3, Appellant filed a motion for determination of competency, a hearing was held by the trial court and the application examined to determine whether sufficient facts had been alleged to raise a doubt as to Appellant's competency to stand trial. In support of the application, defense counsel expressed difficulty in communication and doubt as to Appellant's understanding of the proceedings. Also offered as support were affidavits of two (2) mental health experts who had examined Appellant. The trial court rejected consideration of the affidavits, finding that competency to stand trial meant present state of mind and present ability to communicate. Appellant was then brought before the court for inquiry. Appellant knew his name, age, birth date, the names of his parents and co-defendants, the crime with which he had been charged, the name of his attorney and that she was court appointed, and that he was facing the possibility of the death penalty. The court attempted to inquire further into Appellant's ability to communicate with counsel but was precluded from doing so by counsel's repeated objections that the court might be inquiring into confidential communications. The court found no reason to question Appellant's mental competency, and that Appellant was sufficiently competent to stand trial and to assist counsel.

■ We find the trial court did not abuse its discretion in finding that no doubt

had arisen as to competency. An accused is presumed to be competent to stand trial. 22 O.S.1981, § 1175.4. He has the burden of proving his incompetence to stand trial by clear and convincing evidence. *Ake v. State*, 778 P.2d 460, 464 (Okl.Cr.1989). The test at the hearing to determine competency is whether the accused has sufficient ability to consult with his lawyer and has a rational as well as actual understanding of the proceedings against him. *Id.* The standard of review on appeal is whether there is any competent evidence reasonably supporting the trier of fact. *Miller v. State*, 751 P.2d 733, 738 (Okl.Cr.1988). When the issue of competency is tried before a judge, his finding will not be disturbed on appeal if it is supported by sufficient evidence. *See Moore v. State*, 672 P.2d 1175, 1177 (Okl.Cr.1983). Here, sufficient evidence supported the trial court's ruling as the court's inquiry clearly showed that Appellant understood the nature of the charges and proceedings brought against him and was able to effectively and rationally assist in his defense.

■ Appellant further asserts that the court erred in rejecting consideration of the opinions of the mental health experts and basing its decision solely on personal observation of Appellant. He directs our attention to *Cox v. State*, 644 P.2d 1077, 1079 (Okl.Cr. 1982) and *Johnson v. State*, 73 Okl.Cr. 370, 121 P.2d 625 (1942). In these cases, the application for determination of competency was based upon counsel's sworn statements that the defendant was not competent to stand trial. The trial court denied the application based upon its personal observation of the defendant. This Court found that the sworn statement by counsel, together with the motion was sufficient to legally raise a doubt as to competency. While these cases are persuasive, we find they are limited in their application. Under 22 O.S.1981, § 1175.3(B), the determination as to whether a sufficient doubt has been raised as to the defendant's competency is left to the trial judge. This determination is made based upon the particular facts and circumstance of each case. The trial court is not bound to give precedence to the opinions of expert

witnesses[3] nor is it bound to consider opinions of witnesses which are not relevant to its decision.[4] Therefore, we find no error in the trial court's determination, based upon its own personal observation and inquiry of Appellant, that no doubt as to competency had been raised. The record clearly supports the trial judge's decision.

## JURY SELECTION ISSUES

### A.

◼ In a sub-proposition to his first assignment of error, Appellant argues the trial court erred in refusing to grant each co-defendant the full complement of peremptory challenges during voir dire. He asserts that 22 O.S.1981, § 655, absolutely requires that a defendant be permitted to exercise the full complement of nine (9) peremptory challenges when the defenses of the jointly tried defendants are inconsistent. The State responds by asserting that the defendants did not have inconsistent defenses during the first stage of trial and therefore, they were properly required to share the peremptory challenges. Relying on *Neill v. State*, the State argues that when the defenses are inconsistent only as to culpability or punishment, and not guilt or innocence, the defendants may be properly required to share their peremptory challenges.

The resolution of this issue is solely predicated upon interpretation of state statute. Title 22 O.S.1981, § 655, provides in pertinent part:

> In all criminal cases the prosecution and the defendant are each entitled to the following peremptory challenges: Provided, that if two or more defendants are tried jointly they shall join in their challenges; provided, that when two or more defendants have inconsistent defenses they shall be granted separate challenges for each defendant as hereinafter set forth.

First. In prosecutions for first degree murder, nine jurors each.

The defenses presented by Appellant and his co-defendant were neither mutually antagonistic nor inconsistent as to the guilt stage. The only inconsistencies arose during the presentation of evidence to mitigate punishment during the second stage of trial. However, evidence presented in mitigation of punishment during the second stage of a bifurcated trial is not a legal defense. "Legal defenses are matters which go to the legal exoneration of guilt or evidence which may reduce the charge to a lesser included offense." *Kinsey v. State*, 798 P.2d 630, 633 (Okl.Cr.1990). This does not include penalty phase mitigation evidence presented to the trier of fact for its use in determining appropriate punishment. *See Lafevers v. State*, 819 P.2d 1362, 1371 (Okl.Cr.1991) (Lumpkin, V.P.J. concur in part/dissent in part).

Therefore, what was implicitly stated in *Neill* is now made explicit: the requirement of separate peremptory challenges under 22 O.S.1981, § 655, applies only to legal defenses presented during the guilt/innocence stage of trial. Where the inconsistency goes only to the level of culpability in the punishment stage of a bifurcated trial, Section 655 is not applicable. While Section 655 does not specifically address the issue of mitigation evidence, this interpretation is consistent with the Legislative intent of the statute, for co-defendants tried together to share peremptory challenges during voir dire. Any other interpretation would obviate the language of the statute by finding that co-defendants tried together would always be provided nine separate challenges. See *Owens v. State*, 665 P.2d 832 (Okl.Cr.1983) (statutes are to be interpreted to produce a reasonable result and to promote, rather than to defeat, the general purpose and policy of the law).[5] Any

---

3. *See Bowers v. State*, 648 P.2d 835, 837 (Okl.Cr. 1982) quoting *Dare v. State*, 378 P.2d 339, 346 (Okl.Cr.1963) the testimony of expert witnesses is not conclusive on the issue of mental capacity since the law makes no distinction in weighing evidence between expert testimony and evidence of other character. See also *Moore v. State*, 672 P.2d 1175, 1177 (Okl.Cr.1983).

4. The mental health experts in this case did not interview Appellant for purposes of determining his present competency but rather for purposes of determining his sanity and whether he could distinguish between right and wrong at the time of the offense.

5. See also *City of Norman v. Liddell*, 596 P.2d 879, 882 (Okl.1979); *Wooten v. Hall*, 442 P.2d 334, 336 (Okl.1968) (statutory construction

other interpretation would preclude joint trials in all cases wherein co-defendants were charged with an offense which allowed mitigation evidence in the punishment stage of trial.

## B.

Addressing the remainder of Appellant's allegations of error, not in the order raised in his brief, but in the order of trial proceedings, we begin with the twenty-seventh and final assignment of error. Appellant contends that his conviction and death sentence should be overturned because the jury was selected pursuant to a scheme which systematically excluded certain cognizable classes of citizens, specifically those who do not possess drivers' licenses and those over seventy (70) years of age.

 We have previously addressed the complaint arising from the ability of citizens over 70 years of age to decline to serve if they so desire, and do not find any basis to depart from our previous decisions. *Robedeaux v. State*, 866 P.2d 417, 422 (Okl.Cr. 1993); *Fox v. State*, 779 P.2d 562, 566 (Okl. Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990); *Moore v. State*, 736 P.2d 161, 165 (Okl.Cr.1987), *cert. denied*, 484 U.S. 873, 108 S.Ct. 212, 98 L.Ed.2d 163 (1987).

 Concerning the complaint arising from the selection of those with driver's licenses, we continue to adhere to the test enunciated in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), that to establish a prima facie violation of the fair cross-section requirement, an appellant must show (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires is not fair and reasonable in relation to the number of such persons in the community; (3) this underrepresentation is caused by systematic exclusion of that group in the jury selection process.

 The Supreme Court has never defined the term "distinctive group." However-

which would lead to an absurdity will be avoided if this can be done without violating the evident

er, we see merit in the three-prong test enunciated in *Ford v. Seabold*, 841 F.2d 677 (6th Cir.1988). While we do not find the federal appeals court's definition to be a binding precedent on this Court, we find the analysis helpful in assisting us in determining a "distinctive group":

> (1) that the group is defined and limited by some factor (*i.e.*, that the group has a definite composition such as by race or sex); (2) that a common thread or basic similarity in attitude, ideas or experience runs through the group; and (3) that there is a community of interest among members of the group such that the group's interests cannot be adequately represented if the group is excluded from the jury selection process.

*Id.*, 841 F.2d at 682. Appellant here has not alleged that a distinctive group, as determined by these three factors, has been systematically excluded based solely on their lack of a driver's license. *See Fox*, 779 P.2d at 566. Accordingly, this assignment of error is denied.

## C.

 Appellant contends in his sixth assignment of error that comments by the prosecution during voir dire violated *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by undermining the importance of the jury's sentencing decision. In *Caldwell* the Supreme Court stated that the constitution prohibits imposition of a death penalty which rests on a "determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* 472 U.S. at 320–30, 105 S.Ct. at 2633–40.

The comments at issue in the present case must be viewed in context. The first remark was made as an objection to defense counsel's inquiry:

> Mrs. Baumann: I guess my question was, while you're thinking in terms of the guilt/innocence part, if you'll be thinking at

. legislative intent).

that time what you might have to do coming next, when you come back down here and given your verdict, here's some more evidence, both from the prosecutors, Clifford and Miss Plantz' lawyers, do you think you'll be thinking about I might have to kill these people? Or do you think—

\* \* \* \* \* \*

Mr. Macy: Object to the form of the question. Nobody is going to have to kill anybody, Your Honor.

The Court: Sustained.

(Tr. 575).

The second comment in question was made during the prosecution's voir dire of venire person Rawlings:

Mr. Macy: There's been some terminology used. I want to clarify just a little bit. No one in this court is going to be asked to kill anyone, but we are going to ask the 12 jurors to return verdicts of death. Do you understand what I'm saying?

(Tr. 583)

Defense counsel's subsequent objection was overruled.

■ It is a general rule of this Court that otherwise improper prosecutorial remarks are not grounds for reversal where they are invited, provoked or occasioned by defense counsel or are in reply to this statements. *Carol v. State*, 756 P.2d 614, 617 (Okl.Cr. 1988); *Neal v. State*, 506 P.2d 936, 942 (Okl. Cr.1973). *See also U.S. v. Kaye*, 779 F.2d 1461 (10th.Cir.1985), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1990, 90 L.Ed.2d 671 (1986). The comments in question were clearly an attempt to explain remarks initially made by defense counsel; comments by defense counsel which improperly asked the potential jurors to think about punishment during the guilt/innocence stage of trial. The second comment in question illustrates the prosecution's attempt to explain to a nineteen (19) year old prospective juror the role of the jury in a capital sentencing proceeding. Nothing in the comments mislead the jury in an attempt to insulate them from their decision or sought to give the jury a view of its role in the capital sentencing proceeding that was "fundamentally incompatible with the Eighth Amendment's heightened 'need for reliability

in the determination that death is the appropriate punishment'" in this particular case. *Caldwell*, 472 U.S. at 340, 105 S.Ct. at 2645, 86 L.Ed.2d at 246. When voir dire is read in its entirety, it is clear that a reasonable juror would not have felt that his or her ultimate responsibility for determining the appropriateness of the death penalty was diminished. *See Wade v. State*, 825 P.2d 1357, 1360 (Okl. Cr.1992). Accordingly, this assignment of error is denied.

### D.

■ During voir dire of the venire panel prospective juror Vaughn stated that he could not consider and agree to a verdict which imposed the death penalty. In further inquiry by the court and defense counsel, Mr. Vaughn indicated he could follow the law but could not give equal consideration to the State's case and the imposition of the death penalty, that he could "sit down and consider it, but in the back of my mind, it would always be a negative", and that the State could not persuade him to vote for the death penalty. Mr. Vaughn was excused for cause by the trial court, over a defense objection. Appellant now argues in his fourteenth assignment of error that Mr. Vaughn was improperly excused for cause as his responses did not rise to the standard of exclusion set forth in *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985).

■ In *Wainwright*, the Supreme Court held that the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424, 105 S.Ct. at 852. The Court further stated that a juror's bias need not be proved with "unmistakable clarity;" neither must the juror express an intention to vote against the death penalty "automatically." *Id.* This Court has previously held that we will look to the entirety of the juror's voir dire examination to determine if the trial court properly excused the juror for

cause. *Castro v. State*, 844 P.2d 159, 166 (Okl.Cr.1992); *Davis v. State*, 665 P.2d 1186, 1194 (Okl.Cr.1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 203, 78 L.Ed.2d 177 (1983). Further, as the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion. *Rojem v. State*, 753 P.2d 359, 363 (Okl.Cr.1988).

We find Mr. Vaughn's answers showed that he was irrevocably committed to vote against the death penalty regardless of the law and that his views about capital punishment would have prevented or substantially impaired his performance as a juror in accordance with his instructions and oath. Therefore, the trial court properly dismissed him for cause.

### E.

██ In his fifteenth assignment of error, Appellant argues that trial court improperly limited his ability to voir dire prospective jurors on the issue of mitigation, specifically whether they could consider youth as a mitigating factor. In *Sellers v. State*, 809 P.2d 676, 682–683 (Okl.Cr.1991), we addressed this same argument and stated:

> Appellant next asserts that his rights under the Sixth and Eighth Amendments were violated when the trial judge refused to permit voir dire to determine prospective jurors' attitudes concerning youth as a mitigating factor. The extent of voir dire rests largely in the discretion of the trial court. *VanWoundenberg v. State*, 720 P.2d 328, 332 (Okl.Cr.1986) *cert. denied*, 479 U.S. 956, 107 S.Ct. 447, 93 L.Ed.2d 395 (1986). While it is proper to inquire whether a prospective juror is willing to consider the alternate punishments prescribed for First Degree Murder, we find no abuse of discretion in refusing to permit inquiry into views on particular mitigating circumstances. To permit such questioning would make voir dire an open forum for discussion of any circumstances accompanying the murder, both mitigating and aggravating. The great potential to improperly influence the jury weighs strongly in support of the trial court's ruling in this case.

While a criminal defendant in a State court is guaranteed an impartial jury by the Sixth Amendment, (cite omitted) the Constitution does not always entitle a defendant to propound questions during voir dire specifically directed to matters that conceivably might prejudice veniremen against him. (cite omitted) ... the State in this case was able to fulfill its obligation to impanel an impartial jury with less than a specific inquiry into appellant's area of concern, and this argument must fail.

In the present case, the trial court properly limited Appellant's open ended inquiries to potential jurors about what they could and could not consider as specific mitigating factors. As in *Sellers*, an impartial jury was seated without the specific inquiry sought by Appellant. Accordingly, this assignment of error is denied.

### FIRST STAGE TRIAL ISSUES

#### A.

██ In a sub-proposition to his first assignment of error, Appellant argues that testimony by Homicide Investigator Gibson concerning pre-trial statements made by co-defendant Plantz violated his rights under the Sixth Amendment Confrontation Clause. Detective Gibson testified that during an interview, conducted approximately three (3) days after the murder, Mrs. Plantz denied knowing Appellant and stated that she had a "great relationship" with her husband and a "perfect marriage". Contrary to Appellant's argument, we find that these statements neither inculpate him nor exculpate Mrs. Plantz. These statements are not the type prohibited in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *Lafevers v. State*, 819 P.2d at 1366, and *VanWoundenberg v. State*, 720 P.2d at 331; cases relied upon by Appellant, as they do not relate to the crime itself. The Confrontation Clause guarantees the accused the right to be confronted with the witnesses against him. These statements did not make Mrs. Plantz a witness against Appellant. Therefore, Appellant was not denied his constitutional right of confrontation.

## B.

Appellant argues in his next proposition that his incompetency prohibited him from testifying in his own defense contrary to the constitutions of both the United States and the State of Oklahoma. As discussed above, Appellant failed to raise a doubt as to his competency, therefore he was competent to stand trial. A defendant may waive any of his constitutional rights, so long as those rights are knowingly and intelligently waived. *Connery v. State*, 499 P.2d 462, 466 (Okl.Cr.1972). In this case, Appellant has failed to show that he did not knowingly and voluntarily decide against testifying at trial. Further, the record is void of any governmental action which prevented Appellant from testifying. Accordingly, this assignment of error is denied.

## C.

Appellant asserts in his fourth assignment of error that the trial court erred in denying his motion for a continuance. He claims the court's ruling forced him to trial unprepared and prevented his attorney from effectively representing him, thus in effect, denying his right to counsel. A motion for continuance is directed to the sound discretion of the trial court. Absent an abuse of that discretion, this Court will not disturb the ruling of the trial court. *West v. State*, 798 P.2d 1083 (Okl.Cr.1990). When considering the overruling of a motion for a continuance, we will examine the entire record to ascertain whether or not the appellant suffered any prejudice by the denial. *Waterdown v. State*, 798 P.2d 635, 637 (Okl.Cr.1990).

Appellant filed several motions for a continuance. Each was accompanied by supporting affidavits pursuant to 22 O.S.1981, § 584, and 12 O.S.1981, § 668. *See Waterdown v. State*, 798 P.2d at 637. The affidavits, authored by Appellant's counsel; two investigators from the Oklahoma County Public Defender's Office; Mr. Ravitz, the Public Defender for Oklahoma County and two practicing attorneys, essentially argued that this case was progressing to trial at a faster pace than any other capital case in Oklahoma County and that more time was needed for investigation and preparation. Presented to the court during argument were docket sheets from other capital cases tried in Oklahoma County showing the time frame in which they proceeded to trial. Appellant also presented affidavits from subpoenaed school teachers and counselors who were to testify on his behalf during the second stage of trial but who would be unable to attend the trial due to spring break and scheduling conflicts. Presented to the court more than once, this information secured Appellant a one week continuance which was then extended two (2) more days. We find the court's refusal to continue the trial further was not an abuse of discretion.

Despite limited preparation time, counsel effectively cross-examined the State's witnesses and ably presented Appellant's case. Appellant was not prejudiced by counsel's performance, despite the lack of a third continuance. Further, Appellant was not prejudiced by the absence of the school teachers and counselors. His argument seems to be that it simply was not convenient for these witnesses to appear and testify. The potential witnesses had all been previously subpoenaed by defense counsel. No showing was made as to travel or holiday plans by these potential witnesses which could not be changed. Whether the trial date was convenient for those witnesses is not a result of action taken by the trial court. Further, Appellant has failed to show that the testimony of the absent witnesses was not merely cumulative to that of the fifteen (15) witnesses presented during the second stage of trial. Particularly as to the testimony of Appellant's fifth grade teacher who testified not only as to Appellant's conduct and character that school year but who had also kept in touch with Appellant until approximately the time of the murder. Accordingly, we find no abuse of discretion in the trial court's denial of the continuance as Appellant has failed to show any resulting prejudice.

## D.

Appellant argues next that the trial court erred in refusing to give his requested jury instructions on the lesser included offenses of second degree murder and first

degree manslaughter. Appellant contends that these instructions were proper based upon evidence presented at trial that he had consumed rock cocaine and alcohol the night of the murder and that he was upset by the allegedly abusive relationship between his co-defendant and the decedent. He further argues that this evidence also supported instructions on defense of another, intoxication and incapacity to form specific intent. These requested instructions were also denied by the court.

Jury instructions on lesser included offenses or a theory of defense need only be given when there is evidence in the record to support such instructions. *See Foster v. State*, 714 P.2d 1031 (Okl.Cr.1986); *Green v. State*, 611 P.2d 262, 266 (Okl.Cr. 1980). It is within the trial court's discretion and responsibility to consider the evidence to determine if such instructions are warranted. *Liles v. State*, 702 P.2d 1025 (Okl.Cr.1985). This Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Pham v. State*, 752 P.2d 830, 832 (Okl.Cr. 1988). Appellant presented no evidence in the first stage of trial. Therefore, if his requested instructions were warranted, they must be based upon the evidence presented by the State. Our review of that evidence shows that it was not sufficient to support instructions that Appellant perpetrated the murder but "without a design to effect death" upon the decedent.[6] Appellant and his co-defendant had planned for some time on killing the decedent. They tried to enlist the assistance of various friends and acquaintances in this task. For approximately five

(5) hours they laid in wait for the decedent. Weapons at the ready, they attacked the decedent as he walked in the door to his home. This evidence warrants only an instruction of premeditated, malice aforethought murder.

While testimony was given to the effect that Appellant had consumed certain intoxicants the night before the murder, the record does not support a finding that at the time of the murder Appellant was under the influence of any intoxicant or any person to the extent that he was unable to form the necessary intent to commit first degree murder. *See Jones v. State*, 648 P.2d 1251 (Okl.Cr. 1982), *cert. denied*, 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983).[7] Further, the evidence does not show that co-defendant Plantz was in any "imminent danger of death or great bodily harm" to support an instruction on defense of another. *See Garrett v. State*, 586 P.2d 754, 756 (Okl.Cr.1978). Therefore, the trial court did not err in refusing to give the instructions on the three (3) theories of defense as they were not supported by the evidence. Further, to have given instructions on three different theories of defense would have been inconsistent. *See Robedeaux v. State*, 866 P.2d at 431.[8] Accordingly, this assignment of error is denied.

### E.

Appellant requested the trial court instruct the jury that Clinton McKimble was an accomplice as a matter of law. Such an instruction would require independent corroborating evidence to convict Appellant. The

6. 21 O.S.1981, § 701.8 provides the homicide is murder in the second degree:

(1) when perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.
21 O.S.1981, § 711 provides that homicide is manslaughter in the first degree:
(2) when perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

7. Voluntary intoxication is not a defense to a crime, unless the intoxication rendered the defendant incapable of forming the necessary mental intent.

8. We find this to be an issue of state criminal procedure in which federal constitutional protections do not preclude the procedure adopted. We recognize the United States Supreme Court in *Mathews v. U.S.*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) has allowed instructions on inconsistent defenses in a case concerning the entrapment defense. This ruling was based on federal procedure and the specific facts of the case. We do not find the reasoning in *Mathews* applicable to the instant case.

trial court refused the requested instruction and instead instructed the jury to independently determine whether McKimble was an accomplice. Appellant asserts in his tenth assignment of error that the trial court erred in so instructing the jury and allowed a conviction based upon the unreliable testimony of an accomplice without the guarantee of any independent corroboration.

The test used to determine whether a witness is an accomplice is whether he could be indicted for the offense for which the accused is being tried. *Nunley v. State*, 601 P.2d 459, 462 (Okl.Cr.1979). If the evidence is uncontroverted and it establishes that the witness is an accomplice, the trial judge must so rule as a matter of law and instruct the jury that his testimony requires corroboration. However, if evidence is susceptible to alternative findings that the witness is or is not an accomplice, then the issue is a question of fact to be submitted to the jury under proper instruction. *Id.* See also *Sellers v. State*, 809 P.2d at 686.

In the present case, Clinton McKimble was charged conjointly with Appellant and co-defendant Plantz with first degree murder. McKimble pled guilty and received a life sentence in exchange for his testimony against Appellant. Therefore, the trial court erred in failing to instruct the jury that McKimble was an accomplice as a matter of law. The failure to give the proper instruction is harmless if sufficient corroborating evidence was presented at trial. *Sellers v. State*, 809 P.2d at 686. We find that McKimble's testimony was sufficiently corroborated.[9] Separate forensic and circumstantial evidence placed Appellant at the scene of the crime (Michael Kendrick's testimony that Appellant told him he had killed the decedent, blood stains on Appellant's clothing seen by Kendrick, blood stains on discarded clothing and wash cloths the same blood type as the decedent) in addition to the testimony of all the witnesses to whom Appellant talked about the murder, both before

and after the fact (Michael Kendrick, Roderick Farris, Terry Norman, Ricky Dunn). Further, the jury was repeatedly instructed on the definition of corroboration and that it could not use McKimble's testimony to convict Appellant unless it found that such testimony was corroborated. (See Instructions No. 13, 14, 15). Thus, any error in the trial court's instruction was clearly harmless.

## SENTENCING STAGE ISSUES
### A.

A sub-proposition to his first assignment of error concerns Appellant's perceived inability to fully present his mitigating evidence during the second stage of trial because of the joint trial with co-defendant Plantz. He argues that the joint trial precluded his admission of critical mitigating evidence, particularly evidence showing the "true nature" of his relationship with Mrs. Plantz and the degree of control she exercised in the plan to kill her husband. Appellant presented fifteen (15) witnesses during the second stage of trial. He also attempted to introduce his videotaped confession to the murder arguing that it reflected his motive, mental state, and belief that his co-defendant was being abused by the decedent. The trial court rejected admission of both the videotape and the detective's testimony regarding the contents of the videotape finding that admitting such evidence would violate co-defendant Plantz's right of confrontation.

The sentencer in a capital trial cannot be precluded from considering any relevant mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 877, 71 L.Ed.2d 1, 11 (1982). *See also Hitchcock v. Dugger*, 481 U.S. 393, 397, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347, 399 (1987); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1671, 90 L.Ed.2d 1, 7 (1986). Evidence of the extent of Appellant's relationship with the co-defendant was relevant mitigating evidence as it could, if believed by the jury, lessen his culpability and the severity of his

9. It is not necessary that an accomplice's testimony be corroborated in all material respects. *Johns v. State*, 742 P.2d 1142, 1146 (Okl.Cr. 1987). If the accomplice is corroborated as to one material fact or facts by independent evidence tending to connect the defendant with the commission of the crime, the jury may from that infer that he speaks the truth as to all. *See Pierce v. State*, 651 P.2d 707, 709 (Okl.Cr.1982).

sentence. The trial court's exclusion of this evidence was error. However, this error was harmless beyond a reasonable doubt as there is no reasonable probability that the error might have contributed to the imposition of the death sentence. *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967).

A review of the record shows that Appellant was able to present to the jury evidence of the nature and extent of his relationship with his co-defendant. His father testified that Appellant met the co-defendant when he was seventeen (17) years old, that he had advised Appellant to stay away from the married co-defendant, and that in May 1988, Appellant was troubled by something Mrs. Plantz had said to him. A psychologist testified that Appellant's emotional and intellectual development made him easily susceptible to the suggestions of an older person and that Appellant had killed the decedent because he believed the decedent had given Mrs. Plantz a black eye. While this evidence in itself does not fully describe the nature of the relationship between Appellant and Mrs. Plantz, when combined with evidence introduced during the first stage of trial, which was incorporated into the second stage, the jury is presented with a complete picture. First stage evidence included testimony that Appellant told friends that his girlfriend, the co-defendant, had an abusive husband who had beaten and raped her; that Appellant and Mrs. Plantz had a close physical relationship; that in conversations concerning ways in which to kill the decedent, it was Mrs. Plantz who planned the murder and directed that it look like an accident; in phone conversations after the murder Appellant and Mrs. Plantz voiced concern for each others' welfare and decided to stay close; in conversations before and after the murder Appellant and Mrs. Plantz indicated they would come into a great deal of money and were going to move away; and that after the murder Appellant wore the decedent's clothing as provided by Mrs. Plantz.

The evidence the jury took into punishment stage deliberations included any and all relevant mitigating evidence of the relationship between Appellant and Mrs. Plantz

which was contained in the excluded videotape. Appellant's motive and mental state at the time of the murder was fully presented to the jury through the testimony of both first and second stage witnesses. Instructions to the jury allowed for full consideration of any and all relevant mitigating evidence. The trial court's exclusion of the tape did not impede the jury's ability to consider all relevant facets of Appellant's character in determining punishment. Therefore, as the jury heard all the evidence, there is no reasonable probability that the exclusion of the video tape might have contributed to the imposition of the death sentence.

**B.**

██ In his eighth assignment of error, Appellant contends that prosecutorial misconduct in the second stage closing argument denied him a fair trial. Specifically, Appellant objects to comments which he asserts were improper expressions of the prosecuting attorney's personal beliefs and attempts to bolster those opinions as being endorsed by the State of Oklahoma. The challenged comments are as follows:

> ... Let me, before I go further, explain something to you. As I stand here before you, I represent the State of Oklahoma in the prosecution of this case. Any statements that I make, any opinions that I express are those of the State of Oklahoma based upon the evidence in this trial.... If I slip at any time during this trial and say "I think" or "I believe", what I'm saying to you is that that's the position of the State of Oklahoma on that issue. (Tr. 1785).

Appellant's timely objections to the above remarks were overruled.

██ It is improper for a prosecutor to express his personal opinion of the guilt of the accused, *McCarty v. State,* 765 P.2d 1215, 1220 (Okl.Cr.1988). *See Oklahoma Code of Professional Responsibility,* 5 O.S.1981, Ch. 1, App. 3; *See also ABA Standards for Criminal Justice, The Prosecution Function,* § 3–5.8(b) (1980), or to rely on his expertise as the State's attorney. *Davis v. State,* 665 P.2d 1186, 1200 (Okl.Cr.1983). However, a prosecuting attorney may state his opinion as

to the defendant's guilt when he also states that his opinion is based on the evidence in the case, and where the evidence detailed reasonably tends to support such conclusions. *Walker v. State*, 556 P.2d 1317, 1320 (Okl.Cr. 1976). The comments in the present case come dangerously close to improperly bolstering the prosecutor's conclusions and inducing the jury to trust the State's judgment rather than its own view of the evidence. *See United States v. Young*, 470 U.S. 1, 18, 105 S.Ct. 1038, 1047–48, 84 L.Ed.2d 1, 14 (1985). However, we find the remarks were not so flagrant and improper as to have invaded the province of the jury as trier of fact and prejudiced Appellant. *See Collins v. State*, 758 P.2d 340, 341 (Okl.Cr.1988). Accordingly, this assignment of error is denied.

## C.

■■■ Three (3) eight by ten color photographs of the decedent's charred body were introduced during the second stage of trial to support the aggravating circumstance that the murder was especially heinous, atrocious or cruel. Appellant objects to these photographs in his ninth assignment of error arguing that they were irrelevant and prejudicial. Photographs are admissible if their content is relevant and unless their probative value is substantially outweighed their prejudicial effect. *Smith v. State*, 737 P.2d 1206, 1210 (Okl.Cr.1987), *cert. denied*, 484 U.S. 959, 108 S.Ct. 358, 98 L.Ed.2d 383 (1988); *Oxendine v. State*, 335 P.2d 940, 942 (Okl.Cr.1958). The fact that the pictures are gruesome does not of itself cause the photographs to be inadmissible. The probative value of photographs of murder victims can be manifested numerous ways including showing the nature, extent, and location of wounds, depicting the crime scene, and corroborating the medical examiner's testimony. *Moore v. State*, 736 P.2d at 164.

[39] The photos in the present case are admittedly gruesome. But this gruesomeness is a direct result of Appellant's actions. The photos are more probative than prejudicial as they support the medical examiner's testimony that the decedent was still alive when he was set on fire. The photos also support the aggravating circumstance of especially heinous, atrocious or cruel by showing that the decedent's death was preceded by torture or serious physical abuse. Therefore, we find the trial court did not abuse its discretion in admitting the photographs into evidence.

## D.

[40] In his eleventh assignment of error, Appellant contends the trial court erred in refusing to give jury instructions on specific mitigating factors. The State responds by arguing that the mitigating factors listed by Appellant were either not supported by the evidence or included in instructions given to the jury. We agree.

The specific mitigating circumstances on which Appellant requested jury instructions included the influence exerted over Appellant by his co-defendants, that co-defendant Plantz led Appellant to believe that the decedent had beaten and raped her, that co-defendant Plantz provided alcohol and crack cocaine to Appellant and that Appellant acted in defense of co-defendant Plantz. All but the last circumstance was included in jury instruction No. 15. This instruction listed fourteen (14) specific mitigating factors including but not limited to the circumstances that the crime was the idea of a co-defendant, that Appellant had been consuming alcoholic beverages and crack cocaine immediately prior to the homicide, and that Appellant's emotional and intellectual development made him susceptible to the suggestion of an older person. (O.R. 678). No evidence was presented at trial to support an instruction that co-defendant Plantz was in danger the night of the murder and therefore Appellant acted in her defense. Accordingly, we find the jury was properly instructed as to all mitigating factors supported by the evidence and was not in any way prohibited from considering any and all relevant mitigating evidence. *See Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982). This assignment of error is denied.

## E.

■■■ In his thirteenth assignment of error, Appellant contends the evidence was

insufficient to support the aggravating circumstance of "murder for remuneration" as he was not hired to kill nor did he hire anyone to kill the decedent. Title 21 O.S. 1981, § 701.12(3), defines this aggravator as follows:

> The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration.

The term "remuneration" was defined for the jury to mean "pay an equivalent for, that is to reimburse for a service, loss, or expense. It is also used to connote payment for services performed." (O.R. 673). The traditional application for this aggravating circumstance has been where a defendant has been hired or has hired another person to perform an act of murder. *Johnson v. State*, 665 P.2d 815, 824 (Okl.Cr.1982); *Boutwell v. State*, 659 P.2d 322, 328 (Okl.Cr.1983). Murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy. *Johnson*, 665 P.2d at 824. Evidence in the present case showed that Appellant tried to recruit Roderick Farris to kill the decedent with the promise of forty thousand dollars ($40,000.00) in proceeds from the decedent's life insurance policy; two (2) days after the murder, Appellant told Terry Norman that he was going to have the money and he and co-defendant Plantz were moving out of town where they would have a big house and a pond; and while in the county jail, Appellant told inmate Ricky Dunn that he had killed the decedent for three hundred thousand dollars ($300,000.00). We find this evidence sufficient to support the finding that the murder was motivated by the promise of proceeds from the decedent's life insurance policy. Accordingly, this assignment of error is denied.

### F.

In his sixteenth assignment of error, Appellant challenges the aggravating circumstance of "especially heinous, atrocious or cruel" arguing that it is facially invalid as it failed to adequately channel the jury's discretion. This argument has been repeatedly addressed and rejected by this Court. *Robe-*

*deaux v. State*, 866 P.2d at 433; *Romano v. State*, 847 P.2d 368, 386 (Okl.Cr.1993); *Boltz v. State*, 806 P.2d 1117 (Okl.Cr.1991); *Moore v. State*, 788 P.2d 387, 401–402 (Okl.Cr.1990); *Fox*, 779 P.2d at 576; *Fowler v. State*, 779 P.2d 580, 588 (Okl.Cr.1989); *Nguyen v. State*, 769 P.2d 167, 174 (Okl.Cr.1988); *Rojem v. State*, 753 P.2d at 369; *Hale v. State*, 750 P.2d 130, 142 (Okl.Cr.1988); *Mann v. State*, 749 P.2d 1151, 1160 (Okl.Cr.1988). The jury instruction given in the present case, both paragraphs of Oklahoma Uniform Jury Instructions–Criminal No. 436, embodies the limitations discussed in the above cases which the sentencer must consider in the application and finding of this particular aggravating circumstance. Accordingly, we find that this particular aggravating circumstance was applied in a constitutional manner in the present case.

### G.

■■■■■■ Appellant next challenges the evidence supporting the finding of the aggravating circumstance of "especially heinous, atrocious or cruel". When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. In making this determination, this Court should view the evidence in the light most favorable to the State. *Romano v. State*, 847 P.2d at 387; *Brogie v. State*, 695 P.2d 538, 542 (Okl.Cr. 1985), *modified on other grounds*, 760 P.2d 1316 (Okl.Cr.1988). The evidence supporting a finding that the murder was especially heinous, atrocious or cruel requires proof that the death was preceded by torture or serious physical abuse. *Revilla v. State*, 65 OBJ 1491, —— P.2d —— (Okl.Cr. April 22, 1994); *Stouffer v. State*, 742 P.2d 562, 563 (Okl.Cr.1987). See also *Fox v. State*, 779 P.2d at 576; *Rojem v. State*, 753 P.2d at 369. After making such a determination, we may not only consider the actual physical suffering of the victim, but the attitude of the killer and the pitiless nature of the crime. *Thomas v. State*, 811 P.2d 1337, 1349 (Okl.Cr.1991); *Nuckols v. State*, 805 P.2d 672, 675 (Okl.Cr. 1991).

■ In the present case, the decedent was beaten with baseball bats, the first blow causing him to cry out for his wife. Still alive and moaning from his injuries, Appellant and McKimble loaded the decedent into a pickup, drove to a remote location and set the decedent fire. Medical testimony showed that the decedent was alive and conscious at some point during the fire. While the medical examiner testified it was not possible to determine exactly how long a period of time the decedent was conscious, the physical evidence supports the conclusion that the decedent was alive and attempted to exit the vehicle before succumbing to the smoke and fire. The serious physical abuse suffered by the decedent and the attitude of the Appellant, lighting the pickup twice to make sure it caught on fire, clearly support the jury's finding that the murder was "especially heinous, atrocious or cruel".

## H.

■ In his eighteenth assignment of error, Appellant contends the trial court erroneously allowed the jury to consider sympathy for the victim in sentencing deliberations. Appellant requested that the trial court give the following instruction:

> You are instructed that sympathy for the Accused is a valid consideration in the second stage of the proceedings.... You may consider sympathy for the Accused as a factor for punishing with other than death. (O.R. 862).

The trial court rejected the above instruction in part and gave the following instruction, No. 21:

> .... All the previous instructions given you in the first part of this trial apply where appropriate and must be considered together with these additional instructions. The only exception is that, unlike what you were instructed in the first stage of this trial, you may, in your discretion, consider sympathy as a factor in your deliberations and then determine whether or not you

should give any weight to such factor under all the evidence you have heard in both the first and second stages..... (O.R. 684).[10]

In determining whether an instruction to a California jury informing jurors that they must not be swayed by mere sympathy interfered with the jury's consideration of mitigating evidence, the United States Supreme Court held that the question is what a reasonable juror understands the instruction to mean. *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934, 940 (1987). To determine how a reasonable juror would interpret an instruction, we must focus initially on the specific language challenged. If the specific instruction fails constitutional muster, we then review the instructions as a whole to determine if the entire charge delivered a correct interpretation of the law. *Id.*

In the present case, we find a reasonable juror would not interpret the instruction in a manner that would render it unconstitutional. The instruction itself does not specify to whom the sympathy is to be directed, the accused or the victim. Reading the instruction as a whole, sympathy is mentioned as merely one of many factors for the jury to consider, with the weight of that factor to be determined by the jury. Reviewing the instruction in context of the entire trial, it was given at the end of the penalty phase, after Appellant had produced fifteen (15) witnesses in his favor. It was the last of twenty-one instructions given to the jury during second stage. The instructions preceding it set forth the range of punishment for the offenses Appellant had just been found guilty of committing, the aggravating circumstances alleged against Appellant, Appellant's mitigating evidence, and the guidelines for weighing the aggravating and the mitigating evidence in determining Appellant's punishment. A rational juror could hardly read all of the second stage instructions without concluding that No. 21 referred to sympathy for

**10.** This instruction given during the first stage of trial provided:

> You should not let sympathy, sentiment, or prejudice enter into your deliberations, but should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdicts as the evidence warrants when measured by these instructions. (O.R. 662).

the Appellant.[11] As this is the result sought by Appellant, we find he has no basis upon which to complain of any error in the instruction. See *Staggs v. State,* 719 P.2d 1297, 1294 (Okl.Cr.1986). Accordingly, this assignment of error is denied.

### I.

■ Appellant contends in his nineteenth assignment of error that the death penalty statute, 21 O.S.1981, § 701.11, violates Article 7, § 15, of the state constitution as it requires the jury to make specific findings of fact. In *Romano v. State,* 847 P.2d at 384 we addressed this same argument and stated that "the 'verdict' is a determination of the guilt or innocence of the accused, not the determination of the punishment to be imposed". Therefore, the "challenged portion of Section 701.11 is merely further direction to the jury as to the procedure to be used in determining punishment. Designating the statutory aggravating circumstances found by the jury to support the death sentence does not constitute a verdict with special findings as the result of the jury's second stage deliberations is not a true 'verdict' ".

### J.

■ In his twentieth, twenty-second through twenty-sixth assignments of error Appellant challenges certain second stage jury instructions. Many of these allegations have been raised and addressed by this Court in previous death penalty cases. Where appropriate we refer to our prior decision, finding no need to revisit particular issues.

In his twentieth assignment of error, Appellant contends that the sentencing instructions failed to set forth the proper burden of proof as they did not inform the jury that the State had the burden of proving beyond a reasonable doubt the aggravating circumstances must outweigh the mitigating evidence. This argument was addressed in *Revilla v. State,* 65 OBJ 1491, —— P.2d —— (Okl.Cr. April 22, 1994), wherein we stated:

In his ninth assignment of error he contends that the sentencing instructions failed to set forth the proper burden of proof as they did not inform the jury that the State had the burden of proving beyond a reasonable doubt that the aggravating circumstances must outweigh the mitigating evidence. This argument was rejected in *Johnson v. State,* 731 P.2d 993, 1005 (Okl.Cr.1987), *cert. denied,* 484 U.S. 878, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987) wherein we stated that the "burden of proof" analysis is not strictly applicable to the weighing process of the sentencing stage. We stated further:

It is well settled, . . . that our constitution protects an accused against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' (citations omitted) Our statute follows this proscription and provides that the State must prove beyond a reasonable doubt the existence of at least one of the enumerated aggravating circumstances. However, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a "fact" which must be proved beyond a reasonable doubt, but is a balancing process.

Reviewing the instructions given in the present case as a whole, they stated the applicable law and provided the defendant with the presumption of innocence during the second stage of trial. The instructions allowed a finding that the death sentence was appropriate only where the aggravating circumstances were proven beyond a reasonable doubt. No lesser standard of proof was provided.

Instruction No. 16 in the present case did not improperly shift the burden of proof and when read in context with the other second stage instructions properly set forth the applicable law.

---

11. Even if the jury did read Instruction No. 21 as referring to sympathy for the victim, this would not be exclusive of sympathy for the Appellant. Interpreting instruction No. 21 as referring to sympathy for both Appellant and the victim would not be specifically prohibited by *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

■ In his twenty-second assignment of error, Appellant contends that the trial court's failure to inform the jury that its findings regarding mitigating circumstances did not have to be unanimous violated his rights to a fair sentencing proceeding. Appellant argues that this violated the dictates of *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). This same argument was addressed and rejected in *Pickens v. State,* 850 P.2d 328, 339–340 (Okl.Cr.1993). An instruction identical to that in *Pickens* was given in the present case. In *Pickens,* we referred to our decision in *Stiles v. State,* 829 P.2d 984, 997 (Okl.Cr.1992) wherein we stated:

In both *Mills* and *McKoy,* the Supreme Court held that a unanimity requirement concerning mitigating circumstances resulted in a constitutionally infirm death sentence. However, neither decision mandated that a trial court instruct a capital sentencing jury that unanimity is not required before each juror can consider a particular mitigating circumstance. Because the instructions and verdict forms in the present case did not require unanimity regarding mitigating circumstances, nor could they reasonably have been interpreted to require such, we hold that the jury was not precluded from considering any of the mitigating evidence proffered by appellant.

■ Appellant's twenty-third assignment of error, an objection to Instruction No. 13, was likewise addressed by this Court in *Pickens,* 850 P.2d at 339 wherein we stated:

Appellant further argues that instructing the jury in the permissive language that mitigating circumstances are those which "may be considered" as extenuating or reducing the degree of blame instead of using the mandatory language of "must be considered" allowed the jury to disregard mitigating evidence. We disagree.

It is a well established rule that jury instructions must be read as a whole and not in isolation. *Redden v. State,* 739 P.2d 536, 538 (Okl.Cr.1987); *Luckey v. State,* 529 P.2d 994, 996 (Okl.Cr.1974). This applies to the second stage instructions of a bifurcated trial as well as the instructions in a non-bifurcated trial. In the present case, in addition to the above instruction, the jury was also instructed that the law sets forth "certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence" to impose. The jury was further informed that "you shall consider any or all of the minimum mitigating circumstances which you find apply to the facts and circumstances of this case." The jury was told that they need not limit their consideration to the specifically listed mitigating factors and may consider additional mitigating evidence. Sixteen (16) specific mitigating factors were then listed.

Reading the second stage instructions as a whole, it is clear that the jury was not told to disregard any mitigating evidence. In fact, it would have been an inaccurate statement of the law to instruct the jury that it "must" consider the mitigating evidence presented to reduce the blame as that would take away from the jury its duty to make an individualized determination of the appropriate punishment.

In the present case, the jury was given instructions identical to those in *Pickens.* Instruction No. 15 listed fourteen (14) specific mitigating factors for the jury's consideration. The instructions in the present case correctly stated the applicable law.

■ In his twenty-fourth assignment of error, Appellant finds error in the failure to give an instruction that the jury had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. This issue was also addressed in *Pickens,* 850 P.2d at 339:

Finally, Appellant finds error in the failure to give an instruction that the jury had the option to return a life sentence regardless of its findings respecting aggravating and mitigating circumstances. In *Walker v. State,* 723 P.2d 273, 284 (Okl.Cr.1986), *cert. denied,* 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 600 (1986), the appellant claimed error in the refusal to give his requested instruction on "jury nullification". Defined as "the jury's exercise of its inherent 'pow-

er to bring in a verdict of [acquittal] in the teeth of both the law and facts' ", we found that most courts have uniformly held that a defendant is not entitled to such an instruction. *See also Williamson v. State*, 812 P.2d 384, 410 (Okl.Cr.1991). We find no error in the omission of this instruction in the instant case.

In his twenty-fifth assignment of error, Appellant argues the trial court erred in failing to instruct the jury that it had the option of returning a life sentence regardless of its findings of aggravating and mitigating circumstances. This argument was rejected in *Paxton v. State*, 867 P.2d 1309, 1326 (Okl. Cr.1993) wherein we stated:

> Appellant also argues that Instruction No. 7 authorized imposition of the death penalty although mitigation may have outweighed aggravation. This argument was rejected by this Court in *Johnson v. State*, 731 P.2d at 1003 wherein we stated:
>
> > The idea that the jury may decline to impose the death penalty even if aggravating circumstances are not outweighed by mitigating circumstances is subsumed within an instruction that if the jury finds one or more aggravating circumstances they may consider imposing the death penalty, i.e. that they could, but did not have to, impose the death penalty. (emphasis in original)
>
> Similarly, Instruction No. 9 in the present case did not direct the jury that it must assess death if aggravating circumstances were not outweighed by mitigating evidence, but rather gave it the option of imposing the death penalty if the aggravators outweighed the mitigating evidence.

Instruction No. 12 in the present case was identical to that given in *Paxton*. We find it an appropriate statement of the law.

██ In his twenty-sixth assignment of error, Appellant contends the trial court did not properly instruct the jury on the law regarding the weighing of the aggravating circumstance and mitigating evidence. In *Romano v. State*, 847 P.2d at 392 we stated:

> Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required. *Zant v. Ste-*

*phens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). *See also Walker v. State*, 723 P.2d at 284; *Brogie v. State*, 695 P.2d at 544. The instructions given to the jury properly advised them to weigh the aggravating circumstances against the mitigating evidence. Instructions No. 8 through 12 comprehensively informed the jury that a finding of the aggravating circumstances beyond a reasonable doubt is not by itself enough to assess the death penalty. Rather, the aggravating circumstances must clearly outweigh the mitigating, or death may not be imposed. Similar instructions have passed constitutional muster. *See Davis v. State*, 665 P.2d 1186, 1202 (Okl.Cr.1983).

Instruction Nos. 12–17 in the present case met the above standard.

### K.

██ In his twenty-first assignment of error, Appellant contends that the State of Oklahoma has insufficient guidelines concerning when the death penalty should be sought, and that the decision whether to seek the death penalty lies in the sole discretion of the prosecuting attorney. This same argument was addressed in *Romano*, 847 P.2d at 392. As in *Romano*, we find that Appellant has provided nothing in support of his theory except unsubstantiated speculation. When the statutes and case law are considered together, sufficient guidelines exist to properly direct prosecutorial discretion in making the decision whether to seek the death penalty. Accordingly, this assignment of error is denied.

### ISSUES RELATING TO THE ASSISTANCE OF COUNSEL

In his twelfth assignment of error, Appellant contends that he was denied effective assistance of counsel by counsel's failure to present evidence crucial to his defense. Appellant asserts that the failure to call Chris Cato and Mario Houston, two men who testified at the preliminary hearing to attempts by co-defendant Plantz to solicit them to kill the decedent, denied Appellant his ability to

show the jury the degree of participation and domination of his co-defendants. He argues that counsel failed to deliver on her opening statement promise of producing evidence to show that Mrs. Plantz had solicited other young men to kill her husband. He asserts that the ramifications of counsel's conduct extended into the second stage of trial as he was denied the benefit of the mitigating evidence Cato and Houston's testimony would have provided.

■ The record reflects that in opening statement, counsel stated Marilyn Plantz had solicited other young black males prior to ever talking to the Appellant. An objection by counsel for Mrs. Plantz resulted in a bench conference. Appellant's counsel informed the court that she would prove her statement by questioning the State's witnesses, and that she had witnesses to put on if necessary. (Tr. 921). The court found the issue of Mrs. Plantz' prior personal relationships and prior attempts to recruit others to kill the decedent was not relevant to the first stage of trial. Counsel was directed to refrain from that topic in her opening statement. Near the end of the State's case in chief, counsel for co-defendant Plantz announced that he anticipated the State's next witness to be Chris Cato and that he objected to that testimony. The State indicated it was going to call Mr. Cato to the witness stand. Upon reconvening the next morning, the State did not call Mr. Cato to the stand. At the close of Appellant's case in chief, counsel indicated for the record she was surprised when the State did not call the witness as announced and requested assistance in locating him. The record contains no further mention of Mr. Cato.

It is well established that an accused has a fundamental right to the reasonably effective assistance of counsel, regardless of whether counsel is appointed or retained. U.S. Const. amends. VI, XIV; Okla. Const. art. II, § 20. The standard for evaluating whether an accused received effective assistance of counsel was set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court provided a two-part test which must be applied to determine whether a defendant has been denied effec-

tive assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. This same test applies to a capital case as well as a non-capital case. *Liles v. State*, 702 P.2d at 1034.

■ In hearing a claim of ineffectiveness of counsel, the reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 694–696, 104 S.Ct. at 2070, 80 L.Ed.2d at 699. The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.* The burden rests with the Appellant to show there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*, 466 U.S. at 698, 104 S.Ct. at 2070. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Fisher v. State*, 736 P.2d 1003, 1011 (Okl.Cr.1987); *Cotton v. State*, 679 P.2d 1305, 1308 (Okl.Cr.1984).

Upon a careful review of the record and with an eye towards counsel's overall performance, we cannot say that Appellant's Sixth Amendment right to counsel was violated. Counsel's decision not to call Mr. Cato to the stand was a tactical decision, professionally reasonable under the circumstances. Contrary to Appellant's claim, the court did not find Mr. Cato to be the "essence" of Appellant's defense nor does the evidence support a finding that he was the "heart of the case". Mr. Cato's testimony was not relevant to the first stage of trial as it pertained to a period of time before Appellant became involved with Mrs. Plantz. Therefore, it could have

had no bearing on the question of whether Appellant committed the charged offenses.

Further, the jury was adequately apprised of the relationship between Appellant and Mrs. Plantz. As urged by Appellant, his role was sufficiently placed "in perspective". Through cross-examination of the State's witnesses, counsel made it clear that Mrs. Plantz controlled the planning of the murder and that Appellant acted at her direction. Contrary to Appellant's argument, counsel did not fail to deliver on her opening statement claim but did so through witnesses other than Mr. Cato.

It was not unreasonable for defense counsel to rely on the State's endorsement of Mr. Cato as a witness. Appellant had been declared indigent and was therefore represented by the Public Defenders Office of Oklahoma County. With admittedly limited resources and in light of the trial court's rulings on the subject of prior attempts to kill the decedent, it was reasonable for the defense to rely on the State's calling of this witness.

■ We now turn to whether Appellant was denied effective assistance of counsel during the penalty phase of trial by counsel's failure to present Cato and Houston as mitigation witnesses. As discussed previously, Appellant presented fifteen (15) second stage witnesses. The witnesses testified in part that Appellant was easily dominated by those older than himself and that he felt protective of Mrs. Plantz. This testimony was set against a backdrop of testimony that Mrs. Plantz had attempted to recruit other young men to kill her husband. The testimony of Mr. Cato and Mr. Houston would have been merely cumulative. Appellant has failed to rebut the presumption that the conduct of trial counsel might be considered sound trial strategy.

■ In assessing an Appellant's claim of ineffective assistance of counsel, the reviewing court must judge the reasonableness of counsel's conduct on the facts of the case at hand and *evaluate the conduct from counsel's perspective at the time.* (emphasis added). *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Every effort must be made to eliminate the distorting effects of hindsight. We are to determine whether, in light of all the circumstances of the case, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.,* 466 U.S. at 695, 104 S.Ct. at 2068–69.

". . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Id.* at 690–691, 104 S.Ct. at 2066. In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness under all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.*

In the present case, counsel for Appellant were seasoned attorneys, well versed in the criminal law. The record is replete with numerous pre-trial motions, an exceptional record of objections in voir dire and jurors they would have excused if able, thorough cross-examinations of all state witness, numerous requested jury instructions, and a thorough presentation of relevant mitigating evidence during the second stage. Despite both trial counsel and appellate counsel's protestations of inadequate investigation and preparation time, trial counsel performed in a professionally competent and reasonable manner. Appellant has failed to show that his judgment and sentence were rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's conduct and he has failed to show that the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. Accordingly, we find that Appellant was not denied effective assistance of counsel and this assignment of error is denied.

### MANDATORY SENTENCE REVIEW

■ Pursuant to 21 O.S.Supp.1987, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1981, § 701.12. Addressing the second portion of the statute first, the jury found the

existence of two (2) aggravating circumstances: 1) that the murder was committed for remuneration or the promise of remuneration; and 2) that the murder was especially heinous, atrocious or cruel. As discussed previously, both aggravators were supported by sufficient evidence.

Mitigating evidence was presented by Appellant in the form of fifteen (15) witnesses, including family members, friends, teachers, his probation officer and a psychologist. In addition to mitigating evidence already discussed in this opinion, these witnesses testified to Appellant's young age at the time of the crime, that he had a family who loved him, that Appellant's mother had been unable to care for him due to ill health, that he had a brother who required extra attention, that he suffers from chronic borderline schizophrenia, that he had a neuropsychological deformity made worse by drug use, and that he had no previous criminal record. This evidence was summarized into fourteen (14) factors and submitted to the jury for their consideration as mitigating evidence. Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.Supp. 1987, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence.

■ At this time we also consider Appellant's seventh assignment of error; that the death sentence imposed in this case was arbitrary and constitutionally disproportionate to the life sentence imposed on co-defendant Clinton McKimble. Appellant argues that the culpability of the two men was the same therefore the difference in punishment illustrates the " 'aberrational outcome' that 'any capital sentencing scheme may occasionally produce' "[12] and the type of arbitrary sentencing this Court is statutorily required to review. Appellant directs our attention to

Smith v. State, 659 P.2d 330 (Okl.Cr.1983), wherein the capital defendant's younger co-defendant received leniency and Brogie v. State, 695 P.2d 538 (Okl.Cr.1985), wherein the defendant's death sentence was held not disproportionate to the lesser sentences of accomplices as he was the "leader" of the accomplices.

■ Initially, we must note we do not allow the punishment given a co-defendant to persuade us that the penalty of death is inappropriate in the Appellant's case. See Smith v. State, 659 P.2d at 337. The facts and circumstances of this case provide sufficient justification for the imposition of the death penalty. However, a comparison of the sentences of Appellant and McKimble reinforces our finding that the death penalty is appropriate in this case. Contrary to Appellant's argument, the culpability of the two men was not the same. Appellant, along with co-defendant Plantz actually planned the murder. It was Appellant who sought out and enlisted the aid of McKimble in carrying out the murder plan, after he had unsuccessfully sought the assistance of Roderick Farris and Michael Kendrick. It was Appellant who struck the first two blows to the decedent and who set the decedent on fire. While Appellant's youth might be a mitigating factor his conduct shows him to be more culpable than McKimble. Therefore, we find that his death sentence is not unconstitutionally disproportionate to the life sentence received by McKimble. Accordingly, finding no error warranting reversal or modification, the judgment and sentences for First Degree Murder, Third Degree Arson, Solicitation to Commit Murder and Conspiracy to Commit Murder are **AFFIRMED.**

JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., concur.

CHAPEL, J., dissents.

CHAPEL, Judge, dissenting:

I believe the defenses in this case were mutually antagonistic and the trial should

---

**12.** Appellant's brief, page 52 quoting *Pulley v. Harris*, 465 U.S. 37, 54, 104 S.Ct. 871, 881, 79 L.Ed.2d 29 (1984).

have been severed. However, even if I could accept the majority's view that the defenses in this case were not antagonistic, I could not agree that both these defendants should be required to join in their peremptory challenges. Title 22 O.S.1991, § 655 provides that co-defendants "shall join in their challenges; provided, that when two or more defendants have inconsistent defenses they shall be granted separate challenges ... In prosecutions for first degree murder, nine jurors each." This Court has stated that "[t]rial judges should be ever cognizant that the provisions of Section 655 do not require a showing of mutually antagonistic defenses to have a statutory right to separate peremptory challenges." *Neill v. State*, 827 P.2d 884, 887 (Okl.Cr.1992). *Neill* divided inconsistent defenses into two categories: those that go to culpability and those that relate directly to guilt or innocence. *Id.* Only the latter were held to warrant granting each defendant separate challenges under Section 622, relying on *Murray v. State*, 528 P.2d 739, 740 (Okl. Cr.1974). *Neill*, 827 P.2d at 891.

Reliance on *Murray* in developing this interpretation was improper. *Murray* was decided one year before Section 655 was amended to permit separate challenges where inconsistent defenses exist. In *Murray*, this Court found the defendants' defenses were mutually antagonistic because each defendant exculpated himself and inculpated the other, warranting severance. *Id.* at 740. The Court then briefly discussed peremptory challenges, noting that defendants were denied their statutory right to nine peremptory challenges because each would have received those if severance had been properly granted. *Murray* could not discuss the provision for inconsistent defenses added to Section 655 the next year, and did not discuss the prejudice that arises when defendants are denied their right to exercise nine peremptories each in the same trial. That is the issue before us today.

The legislature in amending Section 655 intended to establish a lower standard than "mutually antagonistic" for separate chal-

lenges in a joint trial.[1] An inconsistent defense that relates directly to guilt or innocence is nothing more than a mutually antagonistic defense. This definition, adopted in *Neill*, should be discarded and this Court should adopt a definition of "inconsistent defenses" which comports with the statute's plain language and the legislature's intent. Defendants have inconsistent defenses if both defenses cannot be true, or one co-defendant must disprove or disparage the defense of the other in order to prove his defense.

By this definition, the defendants' defenses in this case were inconsistent. Both defenses could not be true, and Bryson at least had to disprove or disparage Plantz's defense in order to prove his own. Failure to give each defendant the full complement of nine peremptory challenges resulted in prejudice. The defendants used all nine challenges. Four challenges were used to remove jurors when defendants' motions to remove those jurors for cause were overruled. Defendants made a record of their differing choices and the jurors each would have removed, had they had nine challenges.

Although 20 O.S.1981 § 3001.1 prohibits reversal on mere statutory technicalities unless they rise to the level of a miscarriage of justice or constitute a substantial violation of a constitutional or statutory right, that is not the case here. Denying co-defendants with inconsistent defenses their full share of peremptory challenges is a substantial violation of a federal constitutional right. If a defendant does not receive the amount of peremptory challenges provided by state law, his "right" to peremptory challenges is "denied or impaired" in violation of due process. *Ross v. Oklahoma*, 487 U.S. 81, 89–91, 108 S.Ct. 2273, 2279–80, 101 L.Ed.2d 80 (1988). Appellants met the *Ross* standard by showing that they were denied the amount of peremptories provided by state law, and by indicating on the record the other jurors that

---

1. The standard would have to be lower than mutually antagonistic because once that level is met the question of peremptories in a joint trial is moot. At that point, separate trials are re-quired, at which time defendants obviously also get their full complement of peremptory challenges.

would have been stricken had each been granted the full complement of challenges.