**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 6 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

WILLIAM CLIFFORD BRYSON,

Petitioner-Appellant,

v.

No. 97-6435

RONALD WARD,

Respondent-Appellee.

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA
### (D.C. No. 96-CV-1004)

Don J. Gutteridge, Jr., Oklahoma City, Oklahoma, for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew Edmondson, Attorney General of Oklahoma with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

Before **TACHA**, **BRISCOE**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Petitioner William Clifford Bryson, an Oklahoma state prisoner sentenced to death, appeals from the district court's denial of his federal habeas corpus

petition brought pursuant to 28 U.S.C. § 2254. On appeal, Bryson asserts the trial court (1) violated his right to due process under the Fifth, Sixth, and Fourteenth Amendments when it determined he was competent to stand trial; (2) violated his rights under the Eighth and Fourteenth Amendments by excluding from the capital sentencing proceeding a videotape of his confession to authorities, which he offered as mitigating evidence; (3) erred in failing to instruct the jury that it had the option to return a life sentence even if it found that the aggravating circumstances outweighed the mitigating circumstances; (4) erred in refusing to instruct the jury on the lesser included offenses of second degree murder and first degree manslaughter; and (5) erred in refusing to give the mitigation instructions he requested. [1] Our jurisdiction arises under 28 U.S.C. § 2253, and we affirm.

## I. BACKGROUND

---

[1]      The district court granted a certificate of appealability (COA) on the first two issues. This court granted COA on the other three. Bryson also raised the following issues on appeal: (1) the trial court erred in failing to instruct the jury that it did not have to find the mitigating circumstances unanimously in order to weigh them against the aggravating circumstances; (2) the aggravating factor addressing murders committed for remuneration was improperly applied; (3) the trial court erred in refusing to sever his trial from that of his co-defendant Marilyn Plantz; (4) he was deprived of effective assistance of counsel due to actions of his trial counsel and due to governmental interference; and (5) the aggravating factor that the murder was "especially heinous, atrocious, and cruel" was inappropriately applied. We declined to grant COA as to these issues. After again reviewing the record, Bryson's arguments, and the relevant law, we confirm that Bryson has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and is thus not entitled to COA on those issues.

Bryson first met his co-defendant Marilyn Plantz in late 1987 or early 1988 when he was sixteen and she was in her late twenties and married. In the spring of 1988, they became romantically involved and sexually intimate. Plantz allowed Bryson to drive her car, entertained him and his friends at her home while her husband worked at night, and either provided Bryson with money to purchase alcohol and crack cocaine or purchased them for him.

Also in the spring of 1988, Bryson became acquainted with co-defendant Clinton McKimble. Like Bryson, McKimble was a teenager. McKimble knew that Bryson and Plantz were romantically involved. Bryson and Plantz asked McKimble to help them kill Mr. Plantz.

Having indicated that Mr. Plantz was abusive and that she wanted to kill him to obtain life insurance proceeds, Marilyn Plantz initiated several plans to kill him. She gave Bryson a gun to kill Mr. Plantz, but Bryson either sold or pawned it. Another time, Marilyn Plantz suggested that she lure her husband home from work and that Bryson and McKimble ambush him when he arrived. A third suggestion was that Bryson and McKimble push Mr. Plantz off a boat while fishing and let him drown. None of these schemes was carried out.

On August 17, 1988, one of Marilyn Plantz's schemes was carried further but ultimately failed. Bryson, McKimble, and Rory Jenkins, aided by Marilyn Plantz, stole a car they planned to use to run Mr. Plantz off the road.

Although they followed Mr. Plantz from his workplace, they were unable to carry out the plan because Mr. Plantz took an unexpected route home and Jenkins did not want to go through with the plan.

McKimble offered Roderick Farris $7000 to help kill Mr. Plantz. Farris refused the offer. Subsequently, Bryson offered Farris $40,000 if he could kill Mr. Plantz without Bryson's involvement. When asked by Farris how he intended to kill Mr. Plantz, Bryson indicated that he could catch Mr. Plantz coming home from work, beat him with a bat, and set him on fire in his truck. A few days later, Bryson introduced Farris to Marilyn Plantz. At that time, Bryson offered Farris $10,000 to kill the victim. Marilyn Plantz explained that the killing had to look like an accident. Later that night, Farris was arrested for unrelated reasons.

On August 25, 1988, Plantz, Bryson, and McKimble were together. She withdrew money from her bank, purchased crack cocaine and beer for them, and drove them around until Mr. Plantz had gone to work. The three then went back to her house. Bryson and McKimble drank the beer, smoked the crack cocaine, and fell asleep in the front room. The sound of keys in the front door awakened them. Bryson and McKimble hid in the kitchen with baseball bats supplied by Marilyn Plantz. When Mr. Plantz entered the kitchen, Bryson struck him on the back of the head with the bat. McKimble joined in the beating, while Marilyn

-4-

Plantz waited in her bedroom. The two men carried Mr. Plantz to his pickup truck parked in front of the house and placed him in the truck bed. Marilyn Plantz told them that Mr. Plantz must be burned to make the death look like an accident because Mr. Plantz was beaten so badly. At that time, Mr. Plantz was insured for approximately $299,000.

Bryson and McKimble drove the truck and Marilyn Plantz's car to an isolated area. They placed Mr. Plantz's body in the cab of the truck. McKimble placed a rag in the truck's gas tank and lit it, attempting to cause an explosion. When that did not work, Bryson poured gas in and around the truck and lit it. The truck and Mr. Plantz ignited. Mr. Plantz was alive, but perhaps unconscious, when Bryson and McKimble placed him in the truck and ignited it.

Bryson and McKimble returned to the Plantz home and found Marilyn Plantz cleaning up the blood. The men changed into clothes of Mr. Plantz and dumped their own bloody clothes and rags into a creek. They then went to a convenience store and purchased sandwiches and drinks with money from Mr. Plantz's wallet.

Over the next two days, Bryson and McKimble told some friends about the murder. Bryson told one friend that he planned to move out of town with Marilyn Plantz and purchase a house. McKimble said that he had expected to be paid for the murder.

Bryson was interviewed by police detectives two times after the murder. Although he initially denied involvement, he later confessed. In the second interview, he admitted his relationship with Marilyn Plantz and his drug habit. After his arrest, Bryson twice attempted to commit suicide in jail.

## II. PROCEDURAL HISTORY

Bryson was found guilty of first degree murder, third degree arson, solicitation to commit murder, and conspiracy to commit murder. He was sentenced to death for first degree murder, fifteen years' imprisonment for third degree arson, one hundred years' imprisonment for solicitation to commit murder, and ten years' imprisonment for conspiracy to commit murder. [2] In support of the death penalty, the jury found two aggravating circumstances: (1) the murder was committed for remuneration or the promise of remuneration or another was employed to commit the murder for remuneration or the promise of remuneration; and (2) the murder was "especially heinous, atrocious, or cruel."

On direct appeal, Bryson's convictions and sentence were affirmed. See Bryson v. State, 876 P.2d 240 (Okla. Crim. App. 1994). The United States Supreme Court denied a petition for writ of certiorari. See Bryson v. Oklahoma,

---

[2]     Marilyn Plantz also was found guilty of the same offenses and received the same sentences. McKimble pled guilty to first degree murder and was sentenced to life imprisonment.

513 U.S. 1090 (1995). Bryson filed an application for post-conviction relief in the state district court, which denied relief. The Oklahoma Court of Criminal Appeals affirmed. See Bryson v. State , 903 P.2d 333 (Okla. Crim. App. 1995). The Supreme Court again denied a petition for writ of certiorari. See Bryson v. Oklahoma , 517 U.S. 1144 (1996).

Bryson then filed the present habeas petition in federal district court. His habeas petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and he does not contest the applicability of its provisions. Under amended 28 U.S.C. § 2254(d), as the district court correctly recognized, a state prisoner will be entitled to federal habeas relief only if he can establish that a claim adjudicated by the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Applying this standard, the district court denied relief. It is from this denial of relief that Bryson now appeals. [3]

_____

[3]     Federal courts of appeals have differed in their interpretation of the standards of deference afforded state court adjudications under § 2254(d)(1)'s "contrary to" and "unreasonable application of" language. See, e.g. , Matteo v. Superintendent , 171 F.3d 877, 885-91 (3rd Cir. 1999), and cases cited therein,

(continued...)

## III.  DISCUSSION

A.    Competency to Stand Trial

Bryson argues that the trial court violated his right to due process under the Fifth, Sixth, and Fourteenth Amendments when it determined he was competent to stand trial.  He contends the trial court wrongfully used the clear and convincing standard of proof to determine competency.  Also, he contends the trial court erred in not holding a competency hearing as is required by Okla. Stat. tit. 22, § 1175.3.

---

[3](...continued)
petition for cert. filed, 67 U.S.L.W. 3008 (U.S. June 22, 1999) (No. 98-2050); Nevers v. Killinger, 169 F.3d 352, 357-62 (6th Cir.), and cases cited therein, cert. denied, 119 S. Ct. 2340 (1999).  The United States Supreme Court has granted certiorari in a case to review the Fourth Circuit's interpretation of the standards.  See Williams v. Taylor, 119 S. Ct. 1355 (1999);  see also 67 U.S.L.W. 3608 (Apr. 6, 1999) (listing issues presented).  Under any possible interpretation of the standards, the outcome of this appeal will be the same.

1. Clear and convincing evidence

Bryson argues the Oklahoma Court of Criminal Appeals determined that the trial court applied the then-existing rule in Oklahoma which placed upon the defendant the burden of proving his incompetence to stand trial by clear and convincing evidence. Because the Supreme Court subsequently struck down the clear and convincing evidence standard in Cooper v. Oklahoma, 517 U.S. 348 (1996), Bryson maintains the determination of his competency was erroneous. He further argues that application of this erroneous standard is not harmless error.

Oklahoma law provides for both threshold competency hearings and for full, "post-examination" competency hearings. See Okla. Stat. tit. 22, §§ 1175.2 through 1175.4; see also Cargle v. State, 909 P.2d 806, 815 (Okla. Crim. App. 1995). A trial court holds a threshold hearing to determine whether to order a competency examination of a defendant by a medical expert. See Okla. Stat. tit. 22, § 1175.3. The defendant must make a threshold showing of his incompetency. See Cargle, 909 P.2d at 815. If there is no doubt that the defendant is competent, the criminal proceedings resume. See Okla. Stat. tit. 22, § 1175.3(B), (C). If, however, the trial court has doubt as to the defendant's competency, it will order a medical examination. See id. § 1175.3(D). A full, "post-examination" competency proceeding may then be held. See id. § 1175.4

(before September 1, 1991, the statute required a hearing; as of September 1, 1991, a hearing is not necessarily required). Formerly, at the "post-examination" hearing, the defendant was required to prove incompetency by clear and convincing evidence. See id.

In this case, the trial court held only a threshold competency hearing; it did not hold a "post-examination" competency hearing. Cooper addressed whether clear and convincing evidence was the appropriate standard for "post-examination" competency hearings. See Cooper, 517 U.S. at 350 (citing § 1175.4(B)). Although it did not specifically address the proper standard in threshold competency proceedings under § 1175.3, Cooper held that trying a defendant who is more likely than not incompetent violates the defendant's right to due process. See id. at 350, 369.

Assuming, without deciding, that the holding in Cooper applies to threshold competency hearings, the record in this case does not show that the trial court used the clear and convincing evidence standard to determine competency during its threshold hearing. At no time did the trial court refer to the clear and convincing standard. Rather, the trial court determined that Bryson was unable to make a showing of incompetency under § 1175.3 warranting medical examination and a later full mental competency hearing. Following the language in § 1175.3, the court found there was no doubt that Bryson was competent to

stand trial.   In so finding, the court apparently believed that under any standard he was competent.

It is true that the Oklahoma Court of Criminal Appeals on direct criminal appeal noted that an accused must prove his incompetency by clear and convincing evidence.   See Bryson , 876 P.2d at 249.  In so noting, as the district court stated, the Oklahoma Court of Criminal Appeals was generally reciting the law and neither that court nor the trial court actually applied the clear and convincing standard.   The Oklahoma Court of Criminal Appeals instead recognized that the trial court "found no reason to question [Bryson's] mental competency."   Id.

2.    Competency

Bryson next makes both substantive and procedural due process competency claims. [4]  He argues that the trial court violated his substantive due process rights by determining he was competent to stand trial.  He also argues the

---

[4]     This court recently pointed out that the distinction between substantive and procedural due process is significant because courts evaluate the claims under differing standards.    See Walker v. Attorney Gen.  , 167 F.3d 1339, 1344 (10th Cir. 1999).  Also, this court recognized that the cases occasionally have blurred the distinctions between the two, especially when both are raised together.  See id. Like Walker , we do not attempt to reconcile any inconsistencies because Bryson has failed to establish a right to habeas corpus relief under either the procedural or substantive due process standards.

-11-

trial court did not provide the competency hearing required by Oklahoma statute and did not consider the affidavits of trial counsel or one of his mental health experts, Dr. Murphy, both indicating that he was incompetent. Bryson further contends that the trial court's consideration only of its observation of Bryson at the motion hearing was an abuse of discretion and denial of a meaningful hearing. Bryson, rather, contends that the trial court should have examined Dr. Murphy before making a competency determination. [5]

On direct criminal appeal, the Oklahoma Court of Criminal Appeals concluded the trial court did not abuse its discretion in finding there was no doubt as to petitioner's competency. See Bryson, 876 P.2d at 249. On habeas, the district court thoroughly considered the evidence in the record. The court concluded the trial court's finding that petitioner was competent to stand trial and denial of a full evidentiary hearing on competency "were based upon a reasonable determination of the facts in light of the evidence presented." Dist. Ct. R. Doc. 27 at 25-26.

Competency to stand trial is a factual question. See United States v. Boigegrain, 155 F.3d 1181, 1189 (10th Cir. 1998), cert. denied, 119 S. Ct. 828

_____

[5] Bryson states that Dr. Murphy indicated he was not competent to stand trial. Dr. Murphy, however, did not actually state that Bryson was incompetent. Rather, he testified that he had substantial doubt as to Bryson's competency and further evaluation was required.

(1999). A state court's factual finding of competency is presumed correct. See 28 U.S.C. § 2254(e)(1). A petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. See id. A federal court may not issue a writ of habeas corpus unless the state courts' competency decisions were based on an unreasonable determination of the facts in light of the evidence. See id. § 2254(d)(2).

It is settled that trying an incompetent defendant violates due process. See Cooper, 517 U.S. at 354. The test for determining competency is whether a defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding–and whether he has a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam) (quotation omitted); see also Walker, 167 F.3d at 1343.

In determining whether a full hearing on competency is required, a trial court considers evidence of a defendant's irrational behavior, his courtroom demeanor, and any medical opinion bearing on competency. See Drope v. Missouri, 420 U.S. 162, 180 (1975). A trial court may rely on its own observations of the defendant's comportment. See Boigegrain, 155 F.3d at 1189. Defense counsel is often in the best position to determine whether a defendant's competency is questionable. See Watts v. Singletary, 87 F.3d 1282, 1288 (11th

-13-

Cir. 1996). Nonetheless, the concerns of counsel alone are insufficient to establish doubt of a defendant's competency. See Reynolds v. Norris, 86 F.3d 796, 800 (8th Cir. 1996); see also Drope, 420 U.S. at 177 n.13 (although trial court need not accept counsel's representations regarding defendant's competency without question, court should consider such representations as a factor). A full competency determination is necessary only when a court has reason to doubt a defendant's competency. See Godinez v. Moran, 509 U.S. 389, 401 n.13 (1993); see also Drope, 420 U.S. at 180 ("no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed").

The record in this case reflects that trial was scheduled to start on a Monday. [6] On the preceding Friday, Bryson filed an application for determination of competency. [7] He alleged only the following:

> 1) [Bryson] is currently incompetent to undergo further proceedings in the above-styled action;

> 2) That the following facts are sufficient to raise a doubt as to the competency of [Bryson];

---

[6] The trial was later continued to Wednesday.

[7] One month before filing the motion for a competency determination, Bryson's counsel had filed a motion requesting that he be allowed to personally participate at trial. In that motion, counsel represented that Bryson had the general competence necessary to participate in his defense.

-14-

3) [Bryson] is unable to comprehend his attorney or to meaningfully assist in the defense of his case;

4) [His] mental state and communication abilities are such that they seriously interfere with the understanding of the proceedings against him and with his capability of aiding his attorney in preparation for trial.

Original R. Vol. 2 at 576.

At a hearing held that day, counsel stated that based upon her personal observations, as well as the opinions of mental health experts, she believed that Bryson may be incompetent. She responded vaguely to the court's questions, failing to give specific reasons why she believed Bryson was incompetent. See Motions Hr'g of Mar. 10, 1989 at 288-90 (counsel indicated that she wanted an ex parte hearing to avoid disclosure of privileged information). Although she indicated that she wanted to submit affidavits of the mental health experts in an ex parte hearing, she admitted that these experts had not examined Bryson for competency to stand trial.

The trial judge examined Bryson at the hearing. The judge advised Bryson that he would not question him about the charged crimes and that Bryson should not provide information about them. Bryson indicated that he understood these instructions. In response to the judge's questions, Bryson indicated that he knew his name, his age, his date of birth, the last year he attended school, the last school he attended, his parents' names and address, he and his co-defendants

were charged with murder, the date his trial was to start, who his attorney was and her name, he could receive the death penalty, and he would have a jury trial. He denied, and perhaps was confused about, being questioned by police officers in the Oklahoma City Jail.   He did not know what crimes he had been charged with other than murder.   See id. at 300 (Bryson stated that he knew he was charged with "killing somebody").  He admitted at times he had trouble understanding his attorney, but he did not know if he had problems making her understand him.   Also, he did not know if he had given her the information he thought she needed for the case.   [8]  Bryson was unaware that execution occurred by lethal injection.

At the conclusion of the hearing, the trial judge stated that based on his observations of Bryson and Bryson's answers to his questions, he had no reason to question Bryson's mental competency to stand trial or to assist his counsel. In a written order, the trial court stated there was no doubt that Bryson was competent.   The court found that Bryson understood the nature of the charges and proceedings brought against him and he was able to effectively and rationally assist his attorneys.

---

[8]     Counsel objected to the trial court's further attempts to question Bryson about his ability to communicate with counsel on the basis that the court might inquire into confidential communications.

Bryson subsequently requested a jury trial on the issue of competency and an ex parte hearing before the trial court in order to submit the affidavits of two mental health experts. He sought an ex parte hearing because the affidavits allegedly presented material protected under the attorney-client privilege and attorney work-product doctrine. To support this motion, Bryson's attorney submitted her own affidavit indicating that the mental health experts' affidavits had not been available for the Friday hearing. Counsel again indicated her belief that Bryson was incompetent was based not only upon the opinions of the mental health professionals, but also upon her personal observations. According to counsel, Bryson "has begun to make statements that can only be classified as delusional. He does not seem to be able to differentiate fact from fiction and in this regard cannot rationally and meaningfully assist his attorneys with his defense." Original R. Vol. 2 at 598. It does not appear that the trial court specifically addressed this subsequent request.

The record before the district court and before this court includes only the affidavit of Dr. Murphy. [9] He stated that although he did not conduct his interviews and testing to determine Bryson's mental competency at that time, it

---

[9]  According to the district court's order, the affidavit of the other mental health expert is no longer available. Bryson does not make any arguments on appeal with respect to this expert.

was his opinion that there was a "substantial doubt" that Bryson was competent to stand trial and that further testing was required to "remove the doubt as to his ability to meaningfully and rationally assist his counsel with his defense." Affidavit of Philip J. Murphy at 2.

It appears, as the district court noted, that the trial court may not have considered Dr. Murphy's affidavit. Nevertheless, a state court can find a defendant competent without ordering an evidentiary hearing even if there is psychiatric testimony indicating that he is incompetent. See Carter v. Johnson, 131 F.3d 452, 461 (5th Cir. 1997), cert. denied, 118 S. Ct. 1567 (1998). Here, Dr. Murphy did not state Bryson was incompetent. He merely indicated that Bryson might be incompetent. Also, Dr. Murphy admitted that he had not examined Bryson to determine his competency.

While it may have been preferable for the trial court to have expressly indicated that it had considered and rejected Dr. Murphy's affidavit, failure to do so was not error. This evidence, viewed objectively, did not raise either a bona fide or real, substantial or legitimate doubt as to Bryson's competency. See Walker, 167 F.3d at 1343-44 (standards applicable to procedural and substantive due process claims). Furthermore, the transcript of the hearing shows that Bryson responded rationally, coherently, and lucidly to the trial court's questions. He communicated effectively and answered only the questions asked

without providing extraneous information.  His answers also indicated that he understood the factual nature of the proceedings against him and the possible penalty for conviction and was able to assist counsel.        See Godinez , 509 U.S. at 401 n.12, 402.  Although there is no precise quantum of proof for establishing sufficient doubt,   see Branscomb v. Norris   , 47 F.3d 258, 261 (8th Cir. 1995), the record does not contradict the trial court's assessment, after observing Bryson, that there was no doubt Bryson was competent,      see United States v. Newman   , 733 F.2d 1395, 1401 (10th Cir. 1984).

Thus, the trial court's finding that Bryson's testimony established he was competent and had a rational and factual understanding of the proceedings against him is entitled to a presumption of correctness.  Bryson points to no evidence, other than conclusory assertions of incompetency, to rebut this presumption.  He has therefore failed to rebut the presumption by clear and convincing evidence.  On these facts, the trial court was not required to hold a full competency hearing.   See Godinez , 509 U.S. at 401 n.13.

Also, Bryson did not make a sufficient showing that the trial court should have held an ex parte hearing.  There is no Oklahoma statutory authority for an ex parte hearing.   See Okla. Stat. tit. 22, § 1175.3.  Furthermore, Bryson failed to show that confidential information actually was at stake, thus requiring an

ex parte hearing.   See Wise v. Bowersox , 136 F.3d 1197, 1204 (8th Cir.),   cert. denied , 119 S. Ct. 560 (1998).

Bryson's counsel continued to question his competency immediately before the start of trial and during the guilt and sentencing phases of trial; she indicated that Bryson would not testify due to his incompetency.       See Trial Tr. Vol. I at 3-4 (during hearing on pretrial motions counsel sought reconsideration of Bryson's competency);   id. Vol. V at 1449 (counsel states Bryson will not testify at trial because he is not competent based upon unexplained "things" he told counsel); id. Vol. VI at 1688 (counsel states that Bryson will not testify at sentencing because he is delusional, is incapable of testifying, and would not make sense), id. at 1690 (counsel asserts, without further explanation, that Bryson has changed "dramatically").  Counsel's statements regarding competency, however, were general and vague.

"[A] trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial."   Drope , 420 U.S. at 181.  Here, however, nothing in the record indicates that Bryson engaged in any irrational or unusual behavior during the trial which would lead the trial court to change its decision and to question Bryson's competency.   See Nguyen v. Reynolds  , 131 F.3d 1340, 1346 (10th Cir. 1997), cert. denied , 119 S. Ct. 128 (1998).

Likewise, at his sentencing, it appeared that Bryson was competent and understood the nature of the proceedings. He testified that he recalled the jury's verdict. He indicated that he desired to appeal and wanted court-appointed counsel to do so. Except for indicating he did not understand 1) that an appellate court would decide if he was to be executed, and 2) how he could pay a fine if he was executed, Bryson stated he understood all of the questions the court asked. His failure to understand the first does not indicate incompetency and the district court stated that his failure to understand the second was more likely sarcasm than a lack of understanding.

The record from the state trial court indicates that its competency decision was not based upon an unreasonable determination of the facts in light of the evidence presented to it. See 28 U.S.C. § 2254(d)(2). Also, the trial court did not err in failing to hold a competency hearing. See Sena v. New Mexico State Prison, 109 F.3d 652, 655 (10th Cir. 1997).

B.    Exclusion of Mitigating Evidence

Bryson argues that the trial court violated the Eighth and Fourteenth Amendments by excluding a videotape of his confession, which he sought to admit at the sentencing proceeding as mitigating evidence. The Oklahoma Court of Criminal Appeals held that, while the trial court's exclusion of this mitigating evidence was constitutional error, it was, nonetheless, harmless. See Bryson,

876 P.2d at 256-57.  Respondent does not dispute that the trial court erred in refusing to admit the videotape.

Clearly established Supreme Court precedent provides that a capital sentencer may not refuse to consider, nor be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any circumstance of the offense which the defendant proffers as a basis for the imposition of a sentence less than death.  See, e.g., Skipper v. South Carolina, 476 U.S. 1, 4 (1986) (citing Eddings v. Oklahoma, 455 U.S. 104, 110, 114 (1982), and Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality)).  The Court, however, has never specifically addressed whether the erroneous exclusion of mitigating evidence can ever be harmless.  Cf. Hitchcock v. Dugger, 481 U.S. 393, 398-99 (1987) (granting habeas relief, after noting government made no attempt to argue that sentencer's improper refusal to consider nonstatutory mitigating factors was harmless error); Skipper, 476 U.S. at 7-8 (refusing to deem erroneously excluded mitigating evidence as only cumulative and its exclusion harmless).  The Oklahoma Court of Criminal Appeals' application of a harmless error analysis to the improper exclusion of this mitigating evidence, therefore, was not "contrary to . . . clearly established" Supreme Court precedent.  28 U.S.C. § 2254(d)(1).

Nor was the state court's application of a harmless error analysis an unreasonable application of general Supreme Court principles. This court has previously applied a harmless error analysis to the exclusion of mitigating evidence. See Dutton v. Brown, 812 F.2d 593, 601 & n.8 (10th Cir. 1987) (reh'g en banc) (determining exclusion of mitigating evidence was not harmless). And, although not controlling here, several other circuits have also applied a harmless error analysis in similar circumstances. See, e.g., Boyd v. French, 147 F.3d 319, 322, 327-28 (4th Cir. 1998), cert. denied, 119 S. Ct. 1050 (1999); Sweet v. Delo, 125 F.3d 1144, 1158-59 (8th Cir. 1997) (in dicta), cert. denied, 118 S. Ct. 1197 (1998); see also Knight v. Dugger, 863 F.2d 705, 710 (11th Cir. 1988), and cases cited therein (noting harmless error analysis applies to Lockett errors, but that precise guidelines of analysis are unsettled). See generally O'Brien v. Dubois, 145 F.3d 16, 20-21, 25, 26-27 (1st Cir. 1998) (federal case law, inferior to Supreme Court precedent, may serve as guide in determining reasonableness of state court's application of Supreme Court law). The state court's application of a harmless error analysis to the trial court's erroneous exclusion of the videotape, therefore, was not "an unreasonable application of[] clearly established" Supreme Court precedent, § 2254(d)(1).

Further, we agree with the district court that the exclusion of the videotape did not have a "substantial and injurious effect or influence in determining the

jury's verdict," and was, therefore, harmless error.  Brecht v. Abrahamson,

507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776

(1946)).[10]  More specifically, although it would have taken only a single juror to

preclude imposition of the death sentence, we hold that no reasonable juror

would have considered the excluded videotape sufficiently mitigating to warrant

a penalty less than death.  See Boyd, 147 F.3d at 328; cf. Moore, 153 F.3d at

1110 (addressing whether erroneous denial of mental health expert at capital

sentencing proceeding was harmless; determining whether this court "harbor[ed]

a significant doubt that this evidence would have caused at least one juror to

choose life rather than death") (quotation omitted).

Bryson argues that the videotape would have shown his remorse,

demeanor, state of mind, and motive for the killing, as well as explained the

nature and extent of his relationship with Marilyn Plantz.  The videotaped

confession does not tend to show any remorse.  Further, despite the exclusion of

the videotape, Bryson was able to present other evidence concerning these

mitigating factors.  The excluded videotape did not tend to establish any facts

concerning Bryson's relationship with Plantz that had not already been presented

---

[10]    The Brecht standard in this setting is more rigorous than the
determination under the AEDPA of whether the Oklahoma Court of Criminal
Appeals unreasonably applied the otherwise more rigorous standard in         Chapman
v. California  , 386 U.S. 18, 24 (1967).  We, therefore, need not address, and do not
decide, whether the district court erred in applying        Brecht  in an AEDPA case.

to the jury. In addition, the record, even without the videotape, contains evidence regarding the victim's alleged abuse of Marilyn Plantz, which Bryson asserts was his motivation for the killing. The erroneous exclusion of the videotape, therefore, was harmless. See Boyd, 147 F.3d at 328; Sweet, 125 F.3d at 1158-59.

C.     Option to Return a Life Sentence

Bryson argues the trial court erred in failing to instruct the jury that it had the option to return a life sentence even if it found the aggravating circumstances outweighed the mitigating circumstances. The Oklahoma Court of Criminal Appeals rejected this argument, and held that there is no entitlement to such an instruction. See Bryson , 876 P.2d at 262-63. On habeas, the district court determined that the "instructions fairly and adequately charged the jury that imposition of the death penalty was not required even if the aggravating circumstances were found." Dist. Ct. R. Doc. 27 at 93.

Instruction No. 12 provided that

Should you unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt, you would be authorized to consider imposing a sentence of death.

If you do not unanimously find beyond a reasonable doubt that one or more of the aggravating circumstances existed, you are prohibited from considering the penalty of death. In that event, the sentence must be imprisonment for life or imprisonment for life without parole.

-25-

Original R. Vol. 2 at 675; Trial Tr. Vol. VI at 1744.

This court has upheld this instruction in cases raising the same argument Bryson raises here. See Johnson v. Gibson, 169 F.3d 1239, 1254 (10th Cir. 1999); Duvall v. Reynolds, 139 F.3d 768, 789-91 (10th Cir.), cert. denied, 119 S. Ct. 345 (1998); see also Cooks v. Ward, 165 F.3d 1283, 1290-91 (10th Cir. 1998) (rejecting same argument for substantially similar jury instruction), petition for cert. filed, (U.S. May 14, 1999) (No. 98-9420). In Duvall, this court held that this particular instruction contains "permissive language, which informs the jury that they were not required to impose the death penalty upon a finding of an aggravating circumstance." See Duvall, 139 F.3d at 790. Rather, it "authorized [the jury] to consider imposing a sentence of death" if it found unanimously that one or more aggravating factors existed. Original R. Vol. 2 at 675 (emphasis added); Trial Tr. Vol. VI at 1744 (same). Neither this instruction nor any other instruction precluded the jury from considering mitigating evidence. Furthermore, the trial court did not instruct the jury that it was required to impose the death penalty if it found the aggravating circumstances outweighed the mitigating circumstances. See Duvall, 139 F.3d at 790.

Instruction No. 12 is, therefore, constitutionally permissible. See id. It effectively instructed the jury of its discretion to decline to impose the death penalty, "including by implication the option to impose life imprisonment even if

-26-

the aggravating circumstances outweighed the mitigating." See id. at 790 & n.8; see also Buchanan v. Angelone, 522 U.S. 269, 277 (1998) (approving instruction providing that when aggravating circumstance exists beyond reasonable doubt, jury "may" impose death penalty); Coleman v. Saffle, 869 F.2d 1377, 1394 (10th Cir. 1989) (requiring instructions to preserve jury's responsibility and authority to exercise discretion in sentencing determination).

Bryson relies upon the Oklahoma Uniform Jury Instruction Criminal Second (OUJI-CR 2d) adopted in 1994. OUJI-CR 2d 4-80 expressly instructs a jury that if aggravating circumstances outweigh mitigating circumstances, it may impose either a life sentence or a life sentence without parole. Bryson contends Duvall is not controlling because it did not consider OUJI-CR 2d 4-80 and that the instructions given did not set forth existing Oklahoma law.

This uniform instruction clearly sets forth the settled law. Under Duvall and Johnson, however, the failure expressly to give such an instruction is not constitutional error.

D.    Lesser Included Offenses

Bryson asserts that the trial court erred by instructing the jury on only the capital murder charge and refusing to instruct further on the lesser included, non-capital offenses of second degree murder and first degree manslaughter, in violation of the Eighth and Fourteenth Amendments.  See Beck v. Alabama, 447 U.S. 625, 627 (1980) (capital defendant is entitled to jury instruction on lesser included, noncapital offense, supported by evidence); see also Hopper v. Evans, 456 U.S. 605, 610-12 (1982); Hooks v. Ward, No. 98-6196, 1999 WL 502608, at *17-*24 (10th Cir. July 16, 1999); Stouffer v. Reynolds, 168 F.3d 1155, 1170-71 (10th Cir. 1999); Walker, 167 F.3d at 1349.  The state trial and appellate courts determined that the evidence did not support giving these instructions.  See Bryson, 876 P.2d at 254-55.  We afford this factual determination a presumption of correctness under 28 U.S.C. § 2254(e)(1).  See Hooks, 1999 WL 502608, at *35 (Anderson, J. and Tacha, J., concurring); Boyd v. Ward, No. 98-6309, 1999 WL 370418, at *9 (10th Cir. June 8, 1999) (to be reported at 179 F.3d 904); Newsted v. Gibson, 158 F.3d 1085, 1091 (10th Cir. 1998), cert. denied, 119 S. Ct. 1509 (1999); Lujan v. Tansy, 2 F.3d 1031, 1035

(10th Cir. 1993).[11]  After reviewing the trial record, we agree that the evidence did not support instructions on either of these lesser included offenses.

### 1.	Second degree murder

Oklahoma defines second degree murder, in relevant part, as a homicide "perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual."  Okla. Stat. tit. 21, § 701.8(1).  "A design to effect death is inferred from the fact of killing unless the circumstances raise a reasonable doubt whether such design existed." Hammon v. State, 898 P.2d 1287, 1308 (Okla. Crim. App. 1995).

Subsequent to the state appellate court's decision in this case, the Oklahoma Court of Criminal Appeals held that second degree "depraved mind" murder is not a lesser included offense of first degree malice murder.  See Willingham v. State, 947 P.2d 1074, 1081 (Okla. Crim. App. 1997), cert. denied, 118 S. Ct. 2329 (1998).  It could be argued, therefore, that Beck does not apply. See Hopkins v. Reeves, 524 U.S. 88, 118 S. Ct. 1895, 1898 (1998).  This court

---

[11]	Although this court decided both Newsted and Lujan under the law existing prior to AEDPA's enactment, a federal habeas court is required to afford a presumption of correctness to a state court's factual determinations under both pre- and post-AEDPA law.  See Williamson v. Ward, 110 F.3d 1508, 1513 & n.7 (10th Cir. 1997).  Nothing in AEDPA changes this determination from a question of fact to one of law.

need not decide that issue, however, because even if <u>Beck</u> did apply, the evidence presented at trial was insufficient to support instructing the jury on this offense under the pre-<u>Willingham</u> definition.

The evidence overwhelmingly established that Bryson and Marilyn Plantz plotted to kill the victim for approximately one month prior to the murder. They contacted a number of people in an effort to get someone either to kill the victim or to help them carry out the murder. They also devised a variety of murder schemes and attempted to carry out several of those plans prior to the actual murder. The evidence, therefore, overwhelmingly establishes that this murder was intentional and premeditated.

Bryson argues that he did not have the requisite intent necessary for first degree malice murder because he was intoxicated at the time of the crime and was acting under the influence of Marilyn Plantz. Although the evidence indicates Bryson and McKimble each ingested a $20 rock of crack cocaine and a quart of beer between 10:00 P.M. and 11:30 P.M. the night preceding the murder, McKimble testified that they committed the murder the next morning, between 4:00 A.M. and 5:15 A.M., because it was part of the plan. Moreover, both Bryson and McKimble were subsequently able to relate to others the details of the crime. <u>See generally</u> <u>Charm v. State</u>, 924 P.2d 754, 761 (Okla. Crim. App. 1996) (determining jury instruction on voluntary intoxication defense was not

warranted by evidence, when defendant was subsequently able to describe murder in detail).  Finally, there was uncontradicted trial testimony that smoking crack produces an immediate rush or high, lasting only a very short period of time, perhaps thirty seconds, followed by a quick return to normalcy that would be complete within one hour.

Further, although the evidence indicates that it was Marilyn Plantz's idea to murder her husband in order to collect the insurance money, and that she was the one who devised most of the schemes to murder him, there is no evidence that Bryson's will was overborne by her or that he was acting other than in a voluntary and intentional manner when he killed the victim.  Because the evidence does not suggest anything other than a premeditated design to kill the victim, Bryson was not entitled to a jury instruction on second degree murder. See Douglas v. State, 951 P.2d 651, 672 (Okla. Crim. App. 1997); see also, e.g., Stouffer, 168 F.3d at 1171; Duvall, 139 F.3d at 785-87.

2.      First degree manslaughter

Oklahoma defines first degree manslaughter, in pertinent part, as a homicide "perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon." Okla. Stat. tit. 21, § 711(2).  The requisite elements for heat of passion are: 1) adequate provocation; 2) passion or emotion such as anger, rage, fear, or

terror; 3) a homicide occurring during a state of passion; and 4) the existence of a causal connection between the provocation, passion and homicide. See Fairchild v. State, 965 P.2d 391, 399 (Okla. Crim. App. 1998). The requisite "passion" must be "so great as to render the mind incapable of forming a design to effect death," see Charm, 924 P.2d at 760 (quotations omitted), and is measured by an objectively reasonable standard, see Cheney v. State, 909 P.2d 74, 90 (Okla. Crim. App. 1995). Further, the murder must occur before the murderer has a reasonable opportunity to cool down. See Lewis v. State, 970 P.2d 1158, 1166 (Okla. Crim. App. 1998) (further defining third element of offense).

As adequate provocation justifying the murder, Bryson asserts that the victim had been abusing Marilyn Plantz. There is evidence Marilyn Plantz had told Bryson, during the month preceding the murder, that the victim abused her, but there is no evidence of any abusive incident immediately preceding the murder to establish adequate provocation. See id. (insufficient provocation existed to warrant instructing jury on first degree manslaughter when provoking event did not occur in close proximity to killing, and defendant had reasonable opportunity to cool down). Instead, the evidence establishes that they were motivated to kill the victim to collect his life insurance proceeds. In light of these facts, Bryson was not entitled to a jury instruction on first degree

-32-

manslaughter.  See Turrentine v. State, 965 P.2d 955, 969-70 (Okla. Crim. App. 1998) (defendant was not entitled to have jury instructed on first degree manslaughter when there was no evidence that he committed murder without design to effect death, but instead when evidence indicated he intended to kill victim); see also Stouffer, 168 F.3d at 1171; Walker, 167 F.3d at 1349-50; Charm, 924 P.2d at 760.

E.      Failure to Give Requested Mitigation Instructions

Bryson argues the trial court erred in refusing to give his requested mitigation instructions.  Bryson requested an instruction that the jury consider the following mitigating factors:  1) one or both of the co-defendants exerted considerable influence over him; 2) Marilyn Plantz led him to believe that the victim was beating and raping her; 3) he acted in defense of his lover; and 4) Marilyn Plantz provided alcohol and crack cocaine to him.  Recognizing that the jury could consider all of the evidence it heard, Bryson argues that without specific reference to the four alleged mitigating circumstances the jury may have believed that it could only consider the factors listed in the instructions.  Bryson argues that failure to allow the jury to consider all mitigating evidence is not harmless error.  On direct appeal, the Oklahoma Court of Criminal Appeals held that the instructions allowed the jury to consider fully any relevant mitigating

evidence. See Bryson, 876 P.2d at 257, 258. The district court, on habeas, agreed.

It is settled that a jury may not be precluded from considering any "constitutionally relevant mitigating evidence." Buchanan, 522 U.S. at 276; see Johnson v. Texas, 509 U.S. 350, 361 (1993). "[T]he state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence." Buchanan, 522 U.S. at 276; see Johnson, 509 U.S. at 362. In shaping consideration of mitigating evidence, a jury instruction may list specific mitigating circumstances if it also indicates that the jury may consider any other mitigating evidence. See Blystone v. Pennsylvania, 494 U.S. 299, 307-08 (1990).

These standards were met in this case. Instruction No. 15 listed, among others, the following mitigating circumstances: 1) the age of Bryson at the time of the offense; 2) his age when he first met Marilyn Plantz; 3) the crime was the idea of a co-defendant; 4) Bryson had been consuming alcohol and crack cocaine before the murder; 5) Bryson had a neuropsychological deformity made worse by drug use; 6) Bryson's emotional and intellectual development made him susceptible to the suggestions of an older person; and 7) Bryson was less able than an emotionally and chronologically mature adult to make responsible decisions and consider consequences. Additionally, Instruction No. 13 directed

the jurors that they were to determine the mitigating circumstances under the facts and circumstances of the case.

The Oklahoma Court of Criminal Appeals and the district court correctly determined that the instructions sufficiently encompassed Bryson's first requested mitigating circumstance that one or both of his co-defendants exerted considerable influence over him. Those courts also correctly determined that no evidence supported the third requested mitigating circumstance that Bryson was acting in defense of his lover at the time of the murder.

Instruction No. 15 did not specifically mention the alleged rape and abuse of Marilyn Plantz by the victim or that it was Marilyn Plantz who provided alcohol and crack cocaine to Bryson. There was, however, evidence presented to support these alleged mitigating circumstances. Even though these mitigating circumstances were not listed in the jury instructions, the jurors were instructed that they were to determine the mitigating circumstances under the facts and circumstances of the case. The instructions therefore did not foreclose the jury's consideration of this or any other mitigating circumstances. See Buchanan , 522 U.S. at 277.

Although it may have been preferable for the trial court either to have listed these two as mitigating circumstances or to have specifically instructed the jury that it could consider mitigating factors other than those listed in Instruction

No. 15, the instructions as a whole, considered along with the trial record, did not preclude the jury from giving effect to any mitigating circumstances. Cf. Estelle v. McGuire, 502 U.S. 62, 72 (1991) (ambiguous instruction considered in context of instructions as whole and trial record). It cannot be concluded that there is a reasonable likelihood that the jury applied the mitigating instructions such that they prevented consideration of constitutionally relevant evidence. See Boyde v. California, 494 U.S. 370, 380 (1990). Thus, the Oklahoma Court of Criminal Appeals decision was not contrary to, or did not involve an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1).

## IV. CONCLUSION

After carefully considering each of Bryson's claims, we conclude there was no constitutional error. Accordingly, we AFFIRM the district court's judgment denying Bryson a petition for a writ of habeas corpus.

No. 97-6435,   Bryson v. Ward

BRISCOE, Circuit Judge, concurring:

I concur in the disposition of this case, but write separately to express my disagreement with the majority's handling of two issues.

I.

In deciding whether the trial court's exclusion of proffered mitigating evidence was harmless, the majority cites   Brecht v. Abrahamson  , 507 U.S. 619 (1993), a pre-AEDPA case holding that a federal habeas court need only determine whether such exclusion had a substantial and injurious effect or influence on determining the jury's verdict.  In my view, the      Brecht  standard of review is inapplicable to post-AEDPA cases such as this one.  Instead, our proper function is to determine whether the Oklahoma Court of Criminal Appeals' disposition of this issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  More specifically, we must determine whether the Court of Criminal Appeals reasonably applied the harmless error standard outlined in   Chapman v. California  , 386 U.S. 18, 24 (1967) (requiring government to prove a constitutional error was harmless beyond a reasonable doubt).

Curiously, the majority suggests "[t]he      Brecht  standard in this setting is more rigorous" than the new AEDPA standards of review.  I question if we have a

basis for this conclusion. Until the meaning of the new AEDPA standards of review are sufficiently fleshed out by the Supreme Court, we have no basis for concluding whether one or the other is "more rigorous." In any event, I believe the majority's practice is dangerous because it effectively invites federal habeas courts to "pick and choose" from pre- and post-AEDPA standards of review.

Applying the standard of review set forth in § 2254(d)(1), I conclude the Court of Criminal Appeals' resolution of this issue was neither "contrary to" nor "an unreasonable application of" Chapman. More specifically, I believe the Court of Criminal Appeals properly concluded "there [wa]s no reasonable probability that the error might have contributed to the imposition of [Bryson's] death sentence." Bryson v. State, 876 P.2d 240, 257 (Okla. Crim. App. 1994).

II.

In addressing Bryson's claim that he was entitled to jury instructions on the lesser-included offenses of second degree murder and first degree manslaughter, the majority correctly notes "[t]he state trial and appellate courts determined that the evidence did not support giving these instructions." The majority goes on, however, to characterize the state courts' decisions as "factual determinations" entitled to a "presumption of correctness" under 28 U.S.C. § 2254(e)(1). Although it is not outcome determinative in the case before us, the majority's characterization of these decisions is, in my view, clearly flawed.

Federal habeas courts are required, under both pre- and post-AEDPA law, to afford a presumption of correctness to any "determination of a factual issue made by a State court." 28 U.S.C. § 2254(e)(1) (outlining post-AEDPA standards); see Thompson v. Keohane, 516 U.S. 99, 108-09 (1995) (discussing pre-AEDPA standards); Case v. Mondragon, 887 F.2d 1388, 1392-93 (10th Cir. 1989) (same). For this purpose, "factual issues" are defined as "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators." Townsend v. Sain, 372 U.S. 293, 309 n.6 (1963) (quoting Brown v. Allen, 344 U.S. 443, 506 (1953)). Typically, when resolving factual issues, the factfinder must either choose between or among two or more conflicting versions of the facts or, where a fact is uncontested, make a finding based upon the uncontroverted evidence. As courts of review, appellate courts review fact findings by reviewing the record to determine whether the fact findings are supported by the record. This appellate function does not involve fact finding in the first instance, but rather a review of the record to determine whether the factfinder had an evidentiary basis for its rulings which would satisfy the legal standard in question. Notably, "mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense" and are not entitled to the presumption. Id. at 309 n.6; Case, 887 F.2d at 1393 (presumption of correctness does not attach "to legal

-3-

conclusions or determinations on mixed questions of law and fact"). Thus, our characterization of a state court determination as one of fact or law has critical implications, for it controls the standard of review we apply.

The question here is how to characterize the state courts' determinations that Bryson was not entitled to any lesser included offense instructions. This task is easy because the Oklahoma Court of Criminal Appeals has already characterized such determinations as issues of law. Hooks v. State, 862 P.2d 1273, 1280 (Okla. Crim. App. 1993) ("it is the duty of the trial court to determine as a matter of law whether the evidence presented at trial is sufficient to justify the submission to the jury of instructions on lesser included offenses"), cert. denied, 511 U.S. 1100 (1994). I note this characterization is consistent with the one we have implicitly adopted in direct criminal appeals. See, e.g., United States v. Abeyta, 27 F.3d 470, 473 (10th Cir. 1994) (reviewing as a mixed question of law and fact the trial court's decision not to give a lesser included offense instruction). Further, I believe this characterization is entirely reasonable. In deciding whether the evidence presented at trial was sufficient to warrant the giving of a particular instruction, a court is not deciding basic, primary, or historical facts, nor is its predominant function to make credibility findings.

Precisely how the state courts' determination of this legal issue in Bryson's case can now be transformed into a "factual determination" for purposes of federal habeas review is not explained by the majority. Instead, the majority cites four habeas cases from this circuit:  Hooks v. Ward , 1999 WL 502608 (10th Cir. July 16, 1999);  Boyd v. Ward , 1999 WL 370418 (10th Cir. June 8, 1999); Newsted v. Gibson , 158 F.3d 1085 (10th Cir. 1998),  cert. denied , 119 S. Ct. 1509 (1999), and  Lujan v. Tansy , 2 F.3d 1031 (10th Cir. 1993),  cert. denied , 510 U.S. 1120 (1994).

Addressing these cases in reverse order, I turn first to  Lujan , a pre-AEDPA case brought by a New Me xico state prisoner convicted of first degree murder. The petitioner argued the trial court erred in refusing to give diminished capacity instructions (which would have allowed the jury to determine whether the petitioner "had the ability to form the deliberate intention to take away the life of another"). The  Lujan  panel began its analysis of this claim by noting the New Mexico Supreme Court had rejected the claim on the grounds there was "'evidence in the record that the [petitioner] was able to form a deliberate intention, with no evidence to the contrary.'" 2 F.3d at 1035 (quoting  State v. Lujan , 608 P.2d 1114, 1115 (1980)). With no explanation or citation, the  Lujan panel characterized the New Mexico Supreme Court's conclusion as a "factual finding" entitled to a presumption of correctness under 28 U.S.C. § 2254(d) (the

pre-AEDPA provision that afforded deference to state court factual findings). Id. at 1035. In my view, Lujan is not controlling here. Aside from the fact that the Lujan panel's characterization appears to ignore New Mexico state law, see, e.g., State v. Vallejos, 924 P.2d 727, 734 (N.M. App. 1996) (determination of whether there is some evidence to establish defense and require jury instructions is a question of law), it is not controlling here, where we are characterizing what the Oklahoma state courts did when they applied Oklahoma state law.

In Newsted, another pre-AEDPA case, an Oklahoma state prisoner convicted of first degree murder sought federal habeas relief on the ground that his trial counsel was ineffective for failing to request a heat of passion manslaughter instruction. In analyzing this claim, the Newsted panel began by noting the Oklahoma Court of Criminal Appeals had summarily rejected the claim. The Newsted panel then stated, without explanation or citation, that the Court of Criminal Appeals' decision "necessarily encompassed factual findings about the evidence in th[e] case." 158 F.3d at 1091. It is not clear what the Newsted panel meant by this latter language. To the extent it was only meant to indicate the Court of Criminal Appeals made findings of historical fact about what evidence was properly admitted at the petitioner's trial, I can agree with that proposition. However, to the extent it was intended to suggest the Court of Criminal Appeals made factual findings based upon the evidence properly

admitted at trial, I cannot agree. Because of the vague language employed, as well as the lack of supporting citation, I believe it is appropriate to narrowly interpret the above-quoted language in Newsted.

Having distinguished Newsted and Lujan, I turn to Boyd and Hooks, two post-AEDPA habeas cases from Oklahoma. In each case, the petitioner argued he was deprived of his right to lesser included offense instructions (in Boyd, the challenge was asserted via an ineffective assistance of trial counsel "gateway"). With no citation or analysis, the panels in both cases appear to have concluded the state courts' decisions that the evidence presented at trial was not sufficient to warrant the giving of lesser included instructions were "factual determinations" entitled to a presumption of correctness under § 2254(e)(1). Hooks, 1999 WL 502608 at *25; Boyd, 1999 WL 370418 at *9; but see White v. Scott, 141 F.3d 1187, 1998 WL 165162 (10th Cir. 1998) (table) (concluding "the [state] trial judge's determination not to give a self-defense instruction" was a "mixed question of law and fact").

Assuming, arguendo, the panels in Hooks and Boyd intended to reach these conclusions, I acknowledge we are bound by them. Fortunately, resolution of this issue does not affect the outcome of Bryson's case since he is not entitled to habeas relief regardless of how the Oklahoma courts' decision on the lesser included offense issue is characterized. However, since this issue has potential

ramifications for future habeas cases, it is an issue that should be addressed at some point by the en banc court.